Argued and submitted June 15, 2000, affirmed February 28, 2001

In the Matter of
Alex Ostrer, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF MULTNOMAH COUNTY,
*Respondent,*

*v.*

Mary OSTRER,
*Appellant.*

(9610-830641; CA A108645)

19 P3d 980

Emily S. Cohen argued the cause and filed the brief for appellant.

Laura S. Anderson, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Kistler, Presiding Judge, and Deits, Chief Judge, and Brewer, Judge.

DEITS, C. J.

**DEITS, C. J.**

Mother appeals the trial court's judgment terminating her parental rights to her son.[1] We review *de novo* to determine whether clear and convincing evidence supports the petition for termination. We affirm.

Mother, age 24 at the time of trial, is the parent of three daughters, whose ages at that time were six, seven, and eight. Mother's son (child), who is the subject of this petition for termination of parental rights, was three years old at the time of trial. The three daughters are the children of mother's first husband, Coombs. Mother separated from Coombs when she was 18 or 19, because he was physically and emotionally abusing her in front of the children. Father and mother were married in 1994. They separated shortly thereafter, and mother began a relationship with another man, Brown. During that relationship, mother abused alcohol and drugs and was physically abused by Brown. At that time, mother's three daughters were cared for by a friend. She was unable to care for the children because of her drug problems. The daughters were eventually removed from mother's care by the State of Washington.

Mother became pregnant with child during her relationship with Brown. By her own admission, she continued to use drugs and alcohol during the first five months of that pregnancy. The daughters were returned to mother's care after she signed a service agreement with the State of Washington. Mother and her daughters then moved back to Portland, where she reunited with father. Father acted as a parent to mother's three daughters. Although father initially wanted mother to have an abortion, he eventually agreed to take responsibility for child. Child was born in February 1996. Mother testified that father was emotionally and physically abusive to her after child's birth and that he frequently spanked her three daughters, which concerned her.

---

[1] Child's father's parental rights were terminated on September 14, 1999. Father did not appear for trial, nor did he appeal the trial court judgment terminating his rights.

Child first came to the attention of the State Offices for Services to Children and Families (SCF) on October 21, 1996, on a referral from Oregon Health Sciences University (OHSU). At that time, child was admitted to OHSU for what was believed to be a nonaccidental head injury. Mother told the doctors at OHSU that, on October 15, child had been walking along the back of a couch and hit his head when he fell onto a carpeted floor. Mother said that when she picked him up, he began vomiting. The vomiting continued, and she eventually took child to the emergency room at Kaiser Hospital. Mother was told by the staff at Kaiser that it was normal for vomiting to occur after a head injury. She was given instructions on how to care for a head injury and sent home. Apparently, mother took child back to the Kaiser emergency room several times after that because of his continuing symptoms. On October 20, child was seen by Dr. Cohen at Kaiser. He performed a CT scan on child and then sent him by ambulance to OHSU, because of his concerns about the injury and the possibility of inflicted trauma.

Child was first examined at OHSU by Dr. Lorenz, a pediatrician affiliated with CARES Northwest, who was experienced in evaluating children for sexual and physical abuse. An MRI performed at OHSU revealed a subdural hematoma. Lorenz testified that the amount of force necessary to result in a subdural hematoma is substantial and that child's injury was not consistent with the fall that mother described. Child was also seen at this time by an opthalmologist who found that child had retinal hemorrhages. The opthalmologist testified that these hemorrhages would have resulted from a significant injury and are "almost pathognomonic of child abuse." Based on all of the above information, Lorenz concluded that child's injuries were the result of nonaccidental trauma.

Lorenz also testified about her interaction with mother and father at the hospital. She said that, when she talked with them about the need to keep child in the hospital for observation, father became extremely hostile, belligerent, and uncooperative. When mother tried to calm father, Lorenz stated that father said that his child had not suffered a severe injury and that he did not want to leave his son in the hospital for observation. A police officer, Heimbach, and an SCF

protective worker, Pierson, came to OHSU to investigate the hospital's report that a small child had been admitted with unexplained head injuries. Mother told Heimbach about child's fall and his symptoms. She said that she and father were the child's only caretakers for the last ten days and that, on October 13, father had been home alone with child. Father continued to be hostile and defensive during his interviews with Heimbach and Pierson. He refused to talk about what occurred during the times that he cared for child. Heimbach placed child in protective custody at that time because of his concern that father would remove child from the hospital. SCF then filed a petition alleging that child was within the court's jurisdiction based on an allegation that his parents were unable to explain his nonaccidental injuries. The juvenile court gave SCF temporary custody of child on October 23, 1996, and child was placed in medical foster care.

In June 1997, mother and father stipulated in the juvenile court that child was diagnosed with a subdural hematoma, that the injury occurred while child was in their care and that there was some evidence that this injury was the result of nonaccidental trauma. Based on the stipulation, child was made a ward of the juvenile court and placed in the custody of SCF. Mother and father were ordered to complete parenting classes, undergo psychological evaluations, enroll in anger management classes and follow up on other services recommended for them.

After the June hearing, parents began parenting classes. The caseworker assigned to this case at the time, Loosli, testified that the case was designated as a "red flag" case because of child's injuries. He explained that "red flag" cases are reviewed by staff members who are trained in assessing high-risk cases to allow the development of plans that will decrease the risks to a child. The SCF staff members who evaluated the case in June were concerned about the risks to child due to mother's substance abuse and anger problems, father's inappropriate use of discipline, and the severity of child's injuries when he was eight months old. Despite these concerns, the staff developed a plan to return child to parents' home. The transition plan was developed to attempt to "bridge the gap between mother and SCF with the hope of increasing mother's cooperation with the services

being provided her." The plan included intensive in-home parent training services.

Child was returned to parents' home on September 2, 1997. After child's return to the home, Loosli continued to monitor child's circumstances. He made home visits and had frequent contact with Nakada, the parent counselor from Volunteers of America (VOA) initially assigned to assist father with his parenting skills, because the counselor frequently visited the home. Loosli found the home to be reasonably clean and orderly and said that mother was cooperative. He testified that father was routinely hostile and aggressive toward him and did not want Loosli to meet with mother alone. Loosli said that child's behavior during the visits was often aggressive, violent, and destructive and that mother had trouble controlling child.

In November 1997, Loosli met alone with mother for the first time. She told him that she and father were having marital problems and that she was thinking of leaving him. Mother said that they fought a lot, and she acknowledged to Loosli that a large window in the house was broken during one of their altercations. She told Loosli that she had learned from her anger management classes that father was controlling. She said that he gave her no access to money, often took her car away, and sometimes prevented her from leaving the house. She said that in the past she had asked father for a divorce and that he would not allow it. Mother told Loosli that father told her that the parent trainer knew nothing and that he refused to do anything that the trainer recommended. Despite these concerns, mother told Loosli that she was comfortable living with father, because he provided her with a nice car, a home, and nice clothes for the children.

In November 1997, a review hearing on the case was held in juvenile court. Father appeared at the hearing, but mother did not. Father told the court that mother had relapsed on alcohol and methamphetamines. Loosli thought it was unusual that mother did not appear at the hearing and, consequently, went to see mother. Mother told him that she and father had had a fight during which he had beaten her in front of the children and that he had taken her car keys. She said that father had "jumped on her back and

pounded her." Mother admitted to Loosli that she had been drinking every other weekend and had used marijuana three weeks earlier, although not in the presence of the children. After this visit, Loosli met with his supervisors and, later that night, accompanied by the police, removed child from mother's home. Child was returned to foster care.

Before and after child was returned to foster care, mother participated in a variety of services made available to her. She began anger management counseling in July 1997 and continued that program until the fall of 1998. Mother missed numerous sessions, but Goetz, mother's therapist, testified that mother did benefit from the program and noted in mother's discharge report that her prognosis was mixed. She said that mother came to the program with a high tolerance for abuse and had no understanding of what abuse was, but that she had progressed. Goetz said that, nonetheless, mother was going to have to "turn around and swim upstream. It was a very, very difficult process for her." Mother also attended a domestic violence support group from December 1997 until October 1998. She attended the classes regularly at the beginning but, toward the end, her attendance became sporadic. She did not attend after October 1998. During this time, mother also received considerable assistance, including in-home parenting instruction from her caseworkers.

In November 1998, SCF received a report that mother had been involved in a domestic violence situation involving alcohol. As a result of that incident, SCF filed petitions in juvenile court requesting that her daughters be made dependents of the court. The juvenile court eventually dismissed the petitions, but ordered mother's "absolute compliance" with services. Mother's caseworker at the time, Cobos, referred the family to Intensive Family Services (IFS) for counseling. A counselor at IFS set up a number of meetings with mother, but she showed up for only two meetings and missed a number of others. Mother told the counselor that child was in foster care because of "misunderstandings." IFS's services to mother were eventually terminated because of her failure to attend the scheduled meetings. In February 1999, Cobos referred mother to an IFS domestic violence survivors group. Mother began attending the group sessions at

that time. However, she only attended about one-half of the sessions and was eventually terminated because of her poor attendance.

In early 1999, SCF decided to change the plan for child from reunification to termination of parents' parental rights. That decision was based on the October 1998 domestic violence incident, mother's failure to fully participate in what SCF believed to be necessary services, and father's continuing failure to participate in services. A petition to terminate parents' rights was filed in March 1999.

After hearing all of the evidence, the trial court concluded that mother was unfit by reason of conduct and conditions seriously detrimental to the child and that integration of child into mother's home was improbable within a reasonable time due to conduct and conditions not likely to change. ORS 419B.504. The trial court cited a number of grounds for its decision, including the unexplained injuries to child, mother's mental deficiencies, mother's problems with substance abuse, mother's repeated involvement in abusive relationships, mother's failure to follow through with necessary services, and child's special needs. The trial court also concluded that termination was in child's best interests. ORS 419B.500. Consequently, the trial court held that mother's parental rights should be terminated.

■ In a termination case, the state must prove by clear and convincing evidence that a parent is *presently* unfit by reason of conduct or condition that is seriously detrimental to a child and that integration into the party's home is improbable within a reasonable time due to conduct or conditions not likely to change. ORS 419B.504; *State ex rel Juv. Dept. v. Johnson*, 165 Or App 147, 156, 997 P2d 231 (2000). Mother argues on appeal that, on *de novo* review, this court should conclude that the state failed to meet that burden, because the state did not show that she is presently unfit. Specifically, she argues that the conditions that caused child to be placed in foster care have been ameliorated by her participation and success in parenting, domestic violence, and anger management programs, and that the state has not shown that she cannot meet child's physical and emotional needs at this time.

■     Mother first asserts that the child's initial removal from her home may not have been justified, because child's injuries may have been accidental. Mother takes issue with the trial court's finding that child was physically abused while in parents' care and custody and that parents have failed to provide any explanation for the injury. On *de novo* review, we find that the evidence establishes that child's head injury in 1996 was nonaccidental and that it occurred while child was in parents' care. Dr. Lorenz, an expert in diagnosing child abuse; Dr. Bennett, a pediatric radiologist; and Dr. Schimshock, who examined child, all believed that it was highly probable that child's injury was nonaccidental. Mother attempts to refute this evidence by relying on the testimony of Dr. Piatt, a pediatric neurosurgeon, who also saw child at OSHU. Piatt testified that child's injury could have been caused by a preexisting condition called external hydrocephalus combined with a minor injury. He also said, however, that he could not rule out child abuse. As was the trial court, we are persuaded by the weight of medical evidence that child's injury was nonaccidental.

Mother also asserts that, even if child's injuries were nonaccidental, there is nothing that indicates that she was responsible for the injury. That may be true. Nonetheless, the evidence shows that mother's understanding of the risks posed to child by this incident, and the potential for future incidents, is minimal and that her ability to protect child is limited. Despite being advised by the doctors that the injury likely was nonaccidental, there is no evidence that mother made any effort to determine the cause of the injury, acknowledged in any way at the time of the incident, or later, that father was a possible cause of the injury, or had any recognition that father could pose a danger to child or to her other children.

The experts who evaluated mother, as well as the various service providers who have worked with mother, all seem to believe that, despite some limitations, mother has the potential to become a fit parent. Most, however, had serious reservations as to whether mother could reach her potential. Dr. Brounstein, a psychologist who evaluated mother in 1997, found her to be depressed and to have poor judgment about relationships and associates. He expressed concern

about mother's substance abuse and her ability to make decisions that would be in her child's best interests, given her high needs and dependency. Brounstein said that he had "grave doubts about [mother's] ability to parent and safeguard the child."

Mother was also evaluated by Dr. Deitch in May 1998. He found mother to be of low intelligence, but with no significant psychopathology or personality disturbance. However, her test results on the Child Abuse Potential Inventory were uninterpretable, because she was defensive and in denial in responding to test items. Deitch concluded that mother was "making some progress in her treatment, although progress is likely to be somewhat slower than similar individuals due to her intellectual limitations." He said that her "prognosis is considered to be guarded and will depend on her commitment and consistency with ongoing services."

Mother asserts that she has complied with all of the services and classes that the court and SCF have required that she participate in and, therefore, she has overcome her deficiencies as a parent that led to child's placement in foster care. As discussed above, mother has participated in many of the services that have been offered to her. Unquestionably, she has made some progress in improving her understanding of abuse, her management of anger, and her parenting skills. As mentioned above, it is also true that some of her counselors and teachers have expressed guarded optimism for mother. The problem, however, is that mother has not followed through with many of the services, nor does she appear to have internalized her learning in a way that allows her to meaningfully apply it to her life. Mother's decision to allow her daughters to spend significant unsupervised time with a person whom she knew to have violent tendencies, and who was the suspected abuser of child, is an example of her failure to apply her new understanding and insight regarding abuse to her life.

The trial court's findings regarding mother's participation in and benefit from the services offered to her provide a concise and accurate summary of the evidence on this question:

"Since [1996] the mother has been offered or provided with assistance from the State Office for Services to Children and Families, including but not limited to, referrals for domestic violence counseling, drug and alcohol evaluations, parenting classes, and couple's counseling and a regular visitation schedule, without identifiable lasting progress in her ability to provide adequate care to her child. The mother also received services from the State of Washington in 1995 concerning her other children. Mother engaged in services because 'SCF told me to.' Mother also renewed her Family Abuse Prevention Act Restraining Order because the State Office for Services to Children and Families (SOSCF) told her to. Mother did not complete couple's counseling and her prognosis was mixed unless she continued couple's counseling or got out of the relationship with her husband. Mother has done neither. There are grave doubts about mother's ability to parent this very challenging child given continuing serious concerns.

"Mother appears motivated and sincere but lacks follow-through in almost all areas. She didn't follow through with the foster mother's suggestions, didn't follow through with Social Security benefits for her daughters, didn't follow through with the restraining order, didn't follow through with domestic violence counseling, didn't follow through with couple's counseling, didn't follow through with early intervention, didn't follow through with intensive family services, didn't follow through with AFS, didn't follow through with separating from her husband or getting a divorce, and mother didn't monitor whether father was completing services before he had contact with her child(ren). Mother has made many choices, but not choices favorable to her child."

Mother argues that our decision in *State ex rel Juv. Dept. v. Proctor*, 167 Or App 18, 2 P3d 405, *adhered to on recons* 169 Or App 606, 10 P3d 332 (2000), involves very similar circumstances and supports her argument that the state has not proved her to be unfit as a parent. In that case, the rights of the mother, whose child suffered unexplained injuries, most likely inflicted by the father, were not terminated. There are, however, important differences between this case and *Proctor*. Perhaps the most critical difference is that, in *Proctor*, the mother eventually acknowledged the possibility

that the father caused the child's injury and appeared to recognize the possibility that the father could pose a danger to the child. Further, in *Proctor*, the mother had separated from the father and, based on the evidence before this court, it appeared that the parties' separation was complete and permanent. In contrast, here mother has *completely* failed to acknowledge that father could have caused the injury or could pose any danger to child. Mother is living separately from father. However, she still sees him, is financially dependent on him, and allows her three daughters to spend every other weekend with him with no supervision. Mother's failure to complete programs necessary to the improvement of her personal and parenting skills also demonstrates a further difference between the mother in *Proctor* and mother here in that, in *Proctor*, the mother appeared to be fully committed to the resources offered to her to assist her in overcoming her personal problems and in improving her parenting skills. The evidence in *Proctor* also demonstrated that the mother had followed through completely with the necessary programs. In contrast, in this case, mother has a history of not following through with necessary services.

Mother also argues that the state failed to satisfy its burden of proof as to her unfitness, because it did not prove that child has behavioral or emotional problems that require more parenting skills than mother is capable of providing. The evidence demonstrated, however, that child does have emotional and behavioral problems that require a high level of parenting skill.

Child's foster mothers have described him as a high-maintenance child with limited control over his emotions and a tendency to engage in aggressive behavior. Child's first foster mother described him as one of the most difficult children to care for that she has had. With constant supervision and a very regulated environment, child's behavior while in foster care improved significantly. Child was examined in October 1998 by Dr. Schimschock, a child neurologist. Based on child's history, impulsivity problems, and language delay, Schimschock believed that child has a frontal lobe disturbance. He stated that a child with this type of condition is at high risk and that such a child needs a stable environment with constant management.

■     Again, after reviewing all of the evidence here, we agree with the trial court's assessment of mother's ability to parent this child:

"The child has behavioral and emotional problems which require far greater parenting ability than the mother is capable of providing, even with the assistance of social agencies. This child is very vulnerable to re-injury and is at risk of further abuse. Mother does not appreciate the child's special needs and high level of care. Mother believes loving the child is enough. Mother improved in her parenting skills and gained sufficient insight to adequately visit with her child at the SOSCF offices. But mother does not understand that adequate parenting includes making good choices of partners and avoiding domestic violence. [Child] has improved in medical foster care but continues to need 24 hour supervision, consistency, routine and an understanding caretaker who can maximize his potential. [Child] can attach to an adoptive family."

We conclude, after considering the entire circumstances here, that the state did prove by clear and convincing evidence that mother is unfit by conduct or condition seriously detrimental to child and that integration of child into mother's home is improbable within a reasonable time. The remaining question is whether it is in child's best interests for mother's rights to be terminated. *See* ORS 419B.500. We believe that, given child's special needs and mother's deficiencies and minimal progress in improving her personal and parenting skills, it is in child's best interests for mother's parental rights to be terminated.

Affirmed.