872 A.2d 662

In re ADOPTION/GUARDIANSHIP OF VICTOR A.

No. 72, Sept. Term, 2004.

Court of Appeals of Maryland.

April 12, 2005.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Melanie Klein, Sr. Atty., Legal Aid Bureau, Inc., for petitioner.

Claudia A. Cortese, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for respondent.

Carolyn Johnson, Baltimore, amici curiae.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

In this case, the Prince George's Department of Social Services petitioned for guardianship of Victor A., a child with severe disabilities. The trial court granted the petition and terminated the parental rights of Victor A.'s parents, Mr. A. and Ms. A. We have been asked to consider whether the Court of Special Appeals, in its remand, applied a different standard to determine the best interests of children with special needs, than is applied to children without such needs in a termination of parental rights proceeding.

## I. Facts and Procedural History

Victor A. was born on March 26, 2000, to Ms. A. and Mr. A. He tested positive for cocaine and amphetamines at birth and was diagnosed with severe mental and physical disabilities, including Cerebral Palsy, Mental Retardation, Dysphagia, Myopia, Reflux, Global Developmental Impairment Microcephaly, Encephalopathy, and Failure to Thrive. As a result, Victor A. is severely spastic and is unable to control any of his extremities; he is unable to speak or walk and has a swallowing disorder requiring that he be fed through a gastronomy tube. He must use a wheelchair and braces to keep his legs straight and other supports for his body; he also takes several medications to alleviate his discomfort and to help his breathing. As part of his care, Victor A. requires 16 hours a day of in-home nursing services and has numerous doctors to help manage his disabilities, including a pediatrician, gastrologist, orthopedist, pulmonologist, and an ophthalmologist. He also receives speech therapy, physical therapy, and occupational therapy to prevent further deterioration that may result from his disabilities.

At the time of Victor A.'s birth, Ms. A. was an active drug user, and Mr. A. also was undergoing assessment as a substance abuser; neither could care for Victor A., who, after birth, remained in the hospital for approximately three months. On July 3, 2000, the Prince George's County Department of Social Services (PGDSS), filed an emergency shelter care petition in the Circuit Court for Prince George's County, Division of Juvenile Causes, after which a hearing [1] was held and temporary custody of Victor A. was awarded to PGDSS with instructions to place him with a relative, who PGDSS identified as his maternal aunt. The court allowed Ms. A. to

---

1. Shelter care "means a temporary placement of a child outside of the home at any time before disposition." Md.Code (1973, 2002 Repl.Vol.), § 3–801(w) of the Courts and Judicial Proceedings Article. A shelter care hearing "means a hearing held before disposition to determine whether the temporary placement of the child outside of the home is warranted." Md.Code (1973, 2002 Repl.Vol.), § 3–801(x) of the Courts and Judicial Proceedings Article.

have supervised visitation with Victor A. if she participated in a drug treatment program and remained drug free for three months; Mr. A. was permitted liberal unsupervised visitation unless he was found to have a substance abuse problem, which eventually turned out to be unsubstantiated. Thereafter, Victor A. was declared a child in need of assistance ("CINA") [2] and was released from the hospital. He resided with his aunt until October of 2000, when Ms. A. alleged that Victor A. had been sexually abused by his aunt's son. While the allegations of abuse were being investigated, PGDSS placed Victor A. in foster care, during which time Mr. A. visited Victor A. several times a week. The allegations of abuse were never corroborated, but when Victor A.'s aunt was asked to resume caring for him, she declined.

On January 25, 2001, the Circuit Court conducted a review hearing, during which the judge established a permanency plan [3] of reunification and awarded full custody to Mr. A.

---

**2.** Md.Code (1973, 2002 Repl.Vol.), § 3–801(f) of the Courts and Judicial Proceedings Article defines a CINA as:

"Child in need of assistance" means a child who requires court intervention because:

(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and

(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

**3.** Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), § 5–525(e) of the Family Law Article states:

*Development of a permanency plan.*—(1) In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child. The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings;

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

Three months later, PGDSS filed a petition alleging that Victor A.'s medical needs were not being met, and during a hearing on the matter, the trial court rescinded Mr. A.'s custody, declared Victor A. to be a child in need of assistance for a second time, and placed him in foster care, but allowed Mr. A. and Ms. A. to have daily unsupervised visitation. In order to regain custody of Victor A., Mr. A. signed service agreements to complete parenting skills classes, to participate in a support group for parents of special needs children, and to obtain adequate housing. Ms. A. also agreed to undergo psychological evaluations, to participate in parenting skills classes, and to continue her drug treatment under a service agreement.

Thereafter, on May 28, 2002, the judge changed the permanency plan from reunification with Mr. A. to adoption, after PGDSS had reported that both parents had failed to meet some of the conditions set forth in the various service agreements. PGDSS then petitioned the court for a termination of the parental rights of Mr. A. and Ms. A., and on December 24,

---

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

In addition, Md.Code (1973, 2002 Repl.Vol.), § 3-823(e) of the Courts and Judicial Proceedings Article states:

*Determinations to be made at hearing.*—At a permanency planning hearing, the court shall:

(1) Determine the child's permanency plan, which may be:

 (i) Reunification with the parent or guardian;

 (ii) Placement with a relative for:

 1. Adoption; or

 2. Custody and guardianship;

 (iii) Adoption by a nonrelative;

 (iv) Guardianship by a nonrelative;

 (v) Continuation in a specified placement on a permanent basis because of the child's special needs or circumstances;

 (vi) Continuation in placement for a specified period because of the child's special needs or circumstances; or

 (vii) Independent living; and

(2) For a child who has attained the age of 16, determine the services needed to assist the child to make the transition from placement to independent living.

2002, the court granted PGDSS limited guardianship and reduced each parent's visits to once per month.

Subsequently, on July 18, 2003, the court conducted a two-day termination of parental rights hearing, during which PGDSS sought guardianship of Victor A. for the purpose of having him placed for adoption. The judge assessed Victor A.'s needs in terms of his medical care and each parent's ability to care for him. Although the judge determined that both parents, for the most part, had complied with the service agreements by attending the parenting classes, he also found that Ms. A. had participated in the drug treatment program, submitted to psychological evaluations, and regularly visited Victor A. The court, however, concluded that Ms. A. was unable to care for Victor A. because she had an ongoing substance abuse problem and held that, "the return of Victor, Jr., to his mom does pose an unacceptable risk to [his] future safety[.]" While the judge expressed satisfaction as to Mr. A's compliance with the service agreements and noted that Mr. A. maintained regular contact with and provided for Victor A. financially, he found unacceptable that Mr. A. had failed to secure adequate housing to accommodate Victor A.'s needs, despite Mr. A.'s assurances that he would find appropriate housing if Victor A. were returned to his care.

At the conclusion of the hearing, the judge stated that he was "clearly convinced that the County [was] a better parent and that it [was] in the better interests of [Victor A.]. But whether it [was] in the best interests to terminate his parents' rights [he was] not sure." Thus, the judge reserved ruling on the matter to consider the evidence presented during the hearing regarding the available placement options for Victor A. and whether Mr. A. and Ms. A. could maintain visitation rights if their parental rights were terminated. After the hearing, the court made the following findings in an order issued on September 23, 2003:

This matter, having been brought before this Court by the Prince George's County Office of Law on a Petition for Termination of Parental Rights which was hereby held before this Court for trial on July 18, 2003 and further

hearing held on August 14, 2003, and having heard testimony and having weighed the relevant factors in this matter, it is on this 23rd day of September 10, 2003, by the Circuit Court for Prince George's County, hereby

ORDERED, that this Court concludes that it is in the best interests of Victor [A.] for termination of his natural parents rights; [4] and is further

ORDERED, that this Court hereby grants the Prince George's County Department of Social Services' (hereinafter referred as "Department") petition to be granted guardianship of Victor [A.], with the right to consent to adoption and/or long term care, and further the right to make application to this Court for a change of name; and it is further

ORDERED, that the Court also finds that until such time as the "Department" identifies such adoptive or long-term resource, that it is in the best interests of Victor [A.] to continue visitation with [Ms. A.] and [Mr. A.] under the supervision of the "Department."

ORDERED, that the above-captioned cases are hereby closed statistically.

Mr. A. and Ms. A. appealed the judgment terminating their parental rights to the Court of Special Appeals, arguing that PGDSS had failed to establish by clear and convincing evidence that termination of their parental rights was in Victor A.'s best interests. The intermediate appellate court agreed with Victor A.'s parents in *In re Adoption/Guardianship of Victor A.*, 157 Md.App. 412, 852 A.2d 976 (2004), and held that the trial court did not make adequate factual findings to support a termination of their parental rights. In reaching its

---

4. The court's ability to terminate parental rights is governed by Md. Code (1984, 1999 Repl.Vol.), § 5–313 of the Family Law Article, which we cite in full *infra* and reads in part:

(a) *In general.*—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest[s] of the child to terminate the natural parent's rights as to the child . . .

decision, the Court of Special Appeals opined that the trial court "did not explain its mixed conclusion of fact and law that termination of the As' parental rights [was] in Victor [A.]'s best interest" in light of the numerous findings in favor of preserving the parental rights and that it had failed to determine how continuation of parental rights would harm or diminish Victor A.'s prospects for adoption, pursuant to Maryland Code, Section 5–313(a)(3)(iv) of the Family Law Article (1984, 1999 Repl.Vol.).[5] Thus, the Court of Special Appeals vacated the judgment terminating Mr. A. and Ms. A's parental rights and remanded the case to the trial court to assess all the available permanent placement options for Victor A. in deciding whether termination of parental rights would be appropriate.

PGDSS filed a petition for writ of certiorari in this Court and the Public Justice Center filed a Petition and Memorandum in Support[6] thereof and asked to participate as amici curiae. We granted both petitions and issued the writ of certiorari[7] to consider the following questions, which we have renumbered to clarify the issues in this case:

1. Did the Court of Special Appeals err in reaching and deciding the question of the completeness of the trial court's findings, when that question, which does not pertain to the jurisdiction of either the trial court or the appellate court, was not raised by the appellants?

2. Did the Court of Special Appeals err in holding that a different standard applies to determining whether adoption or long-term foster care is in the best interest of disabled children than applies to nondisabled children, in contravention of the American with Disabilities Act

---

5. Md.Code (1984, 1999 Repl.Vol.), § 5–313(a)(3)(iv) reads:
 [A] continuation of the relationship between the natural parent and the child would diminish greatly the child's prospects for early integration into a stable and permanent family.

6. The Maryland Disability Law Center joined in the amicus curiae.

7. *In re Adoption of Victor A.*, 383 Md. 211, 857 A.2d 1129 (2004).

and the strong legislative policy, recognized and approved by this Court's binding precedent, favoring permanency for all children?

For the reasons stated herein, we affirm the judgment of the Court of Special Appeals vacating the order terminating both parent's parental rights and remanding the case to the trial court for further proceedings.

## II. Standard of Review

We utilize three interrelated standards to review a trial court's decision to terminate parental rights, as set forth in *In re Yve S.*, 373 Md. 551, 819 A.2d 1030 (2003):

> [W]e point out three distinct aspects of review in child custody disputes. When the appellate court scrutinizes factual findings, the clearly erroneous standard of [Rule 8–131(c)] applies. [Second,] [i]f it appears that the [court] erred as to matters of law, further proceedings in the trial court will ordinarily be required unless the error is determined to be harmless. Finally, when the appellate court views the ultimate conclusion of the [court] founded upon sound legal principles and based upon factual findings that are not clearly erroneous, the [court's] decision should be disturbed only if there has been a clear abuse of discretion.

*Id.* at 586, 819 A.2d at 1051, quoting *Davis v. Davis*, 280 Md. 119, 122–26, 372 A.2d 231, 232–34 (1977); *see also Robinson v. Robinson*, 328 Md. 507, 513, 615 A.2d 1190, 1193 (1992); *McCready v. McCready*, 323 Md. 476, 484, 593 A.2d 1128, 1131 (1991).

## III. Discussion

PGDSS contends that the Court of Special Appeals erred by enunciating a different standard for assessing the best interests of children with special needs or circumstances than is applied to children without such needs. In PGDSS's view, the statutory time lines for achieving permanence were intended to apply to all children without regard to a child's disabilities. PGDSS also asserts that the Court of Special Appeals decided an issue that was not before the court when it addressed

whether the trial court had made all of the requisite findings needed to terminate parental rights. According to PGDSS, Mr. A. and Ms. A. raised only two claims in the intermediate appellate court: "that [Victor A.'s] disabilities make it more appropriate to leave him indefinitely in foster care than to free him for adoption and that the trial court had erred in finding that neither of them [Mr. A. and Ms. A.] will become able to care for [Victor A.] in the reasonably foreseeable future," which did not include a determination about the trial court's findings.

To the contrary, Mr. A. and Ms. A. maintain that the Court of Special Appeals did not apply a different standard to determine the best interests of children with disabilities than that is applied to children without special needs. Victor A.'s parents contend that the Court of Special Appeals's explanation of the applicable statutes did not distinguish between disabled and nondisabled children and that the holding was limited to the trial court's findings in terminating their parental rights. Mr. A. and Ms. A. further assert that the trial court's findings were properly raised because the Court of Special Appeals was asked to determine whether the trial court had erred in terminating their parental rights and within this inquiry was whether the trial court's findings adequately supported the trial court's decision.

In this case we are presented with a unique issue of whether children with special needs in the child welfare system are subject to a different legal standard in the determination of the "best interests standard" than is applied to children without such needs. The fundamental problem presented by this case warrants discussion of the child welfare system's purpose and principles.

## A. Fundamental Rights of Parents

■ The appropriate starting point in our analysis when the State intervenes in family relations is the fundamental rights of a parent. Certain fundamental rights are protected by the United States Constitution, and among those rights are a parent's right to raise his or her children without undue

interference by the State. *In re Yve S.*, 373 Md. at 565, 819 A.2d at 1039; *In re Adoption /Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 692, 796 A.2d 778, 793 (2002); *In re Mark M.*, 365 Md. 687, 705, 782 A.2d 332, 342 (2001). The United States Supreme Court has long recognized that a parent has a constitutionally protected fundamental right to raise his or her children. *See In re Yve S*, 373 Md. at 566–67, 819 A.2d at 1039; *In re Mark M.*, 365 Md. at 705, 782 A.2d at 342–43; *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112–13, 642 A.2d 201, 208 (1994).

Most recently, in *In re Yve S.*, we affirmed this principle and stated that a parent's interest "occupies a unique place in our legal culture, given the centrality of family life as the focus for personal meaning and responsibility. '[F]ar more precious . . . than property rights,' parental rights have been deemed to be among those 'essential to the orderly pursuit of happiness by free men. . . .' " *Id.* at 567, 819 A.2d at 1039, quoting *In re Adoption/Guardianship No. 10941*, 335 Md. at 113, 642 A.2d at 208, in turn quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981); *In re Mark M.*, 365 Md. at 705, 782 A.2d at 342–43. Likewise, in *In re Mark M.*, we emphasized the importance of parenting as a fundamental right:

> A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000) (stating that "the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children"); *See also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing "the fundamental liberty interest of natural parents in the care, custody, and management of their child"); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972) (stating that "[t]he rights to conceive and to

raise one's children have been deemed 'essential,' "and that "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment . . . the Equal Protection Clause of the Fourteenth Amendment . . . and the Ninth Amendment. . . .") (internal citations omitted). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it "cannot be taken away unless clearly justified." *Boswell v. Boswell*, 352 Md. 204, 218, 721 A.2d 662, 669 (1998)(citing *In re Adoption No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994)).

*Id.* at 705, 782 A.2d at 342–43.

■ In termination of parental rights proceedings where the State has intervened through the exercise of its generally recognized power to protect the child by reason of the natural parent's unfitness, the standard is based upon the best interests of the child, *see McDermott v. Dougherty*, 385 Md. 320, 869 A.2d 751 (2005); *In re Adoption/Guardianship No. 10941*, 335 Md. at 112, 642 A.2d at 208, and there is a strong presumption in favor of maintaining parental rights to serve the child's best interests. *See In re Yve S.*, 373 Md. at 571, 819 A.2d at 1042; *In re Adoption/Guardianship No. 10941*, 335 Md. at 112, 642 A.2d at 208; *In re Adoption /Guardianship Nos. J9610436 and J9711031*, 368 Md. at 692, 796 A.2d at 793. We explained this presumption in *In re Yve S.*:

The best interests of the child standard embraces a strong presumption that the child's best interests are served by maintaining parental rights. If it were otherwise, the most disadvantaged of our adult citizens always would be at greater risk of losing custody of their children than those more fortunate. Those of our citizens coping with emotional or mental difficulties could be faced with such discrimination.

*Id.* at 571, 819 A.2d at 1042 (internal citations omitted).

■ A parent's right to raise his or her children, however, is not beyond limitation, and there may be countervailing considerations that the State, pursuant to its *parens patriae*

authority, must protect. We emphasized these considerations in *In re Mark M.:*

> That fundamental interest [in raising a child], however, is not absolute and does not exclude other important considerations. Pursuant to the doctrine of *parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. *See Boswell,* 352 Md. at 218–19, 721 A.2d at 669. We have held that "the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute." *Boswell,* 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941,* 335 Md. at 113, 642 A.2d at 208 (stating that "the controlling factor ... is ... what best serves the interest[s] of the child"). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we stated in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is "a consideration that is of 'transcendent importance'" when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted).

> \*　　\*　　\*

> We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.,* 357 Md. at 448, 745 A.2d at 417.

> \*　　\*　　\*

> A trial court, acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests.

*Id.* at 705–06, 782 A.2d at 343.

## B. The Child Welfare System

The fundamental right of parents to raise their children is not only well settled in our common law, but also is reflected

in federal and Maryland legislation. The role of federal and Maryland statutes relating to the child welfare system was explained in *In re Yve S.,* quoting from Judge Karwacki in *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 103–06, 642 A.2d 201, 203–05 (1994):

> The Maryland General Assembly has enacted a comprehensive statutory scheme to address those situations where a child is at risk because of his or her parents' inability or unwillingness to care for him or her. Title 5 of the Family Law Article of the Maryland Code (1984, 1991 Repl.Vol.) (Hereinafter "F.L.") governs the custody, guardianship, adoption and general protection of children who because of abuse or neglect come within the purview of the Department of Human Resources. . . .

> * * *

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as "foster care drift" and resulted in the enactment by Congress of Public Law 96–272, the "Adoption Assistance and Child Welfare Act of 1980," codified at 42 U.S.C. §§ 610–679 (1988). One of the important purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another

permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial review is to "determine the future status of the child" including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster case on a long term basis. 42 U.S.C. § 675(5)(C).

Maryland receives considerable federal funds pursuant to this Act. Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements. Under Maryland's statutory scheme, for those children committed to a local department of social services the department is required to develop and implement a permanency plan that is in the best interests of the child. F.L. § 5–525.

In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5–525(c). First and foremost, the department must consider returning the child to the child's natural parents or guardians. F.L. § 5–525(c)(1). If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted. F.L. § 5–525(c)(2). If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. F.L. § 5–525(c)(3). Only in exceptional situations as defined by rule or regulation is a child to be placed in long term foster care. F.L. § 5–525(c)(5).

If it is determined that reunification is not possible and that adoption is in the child's best interests, the juvenile court lacks jurisdiction to finalize this plan. *In re Darius A.*, 47 Md.App. 232, 235, 422 A.2d 71, 72 (1980); *see also*

F.L. § 1-201. Instead, unless the parents consent to the adoption of their child, the department is required to petition the circuit court for guardianship pursuant to F.L. § 5-313. If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interests of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department's petition for guardianship. Such award carries with it the right for the department to consent to the adoption of the child. F.L. §§ 5-311 and 5-317(f).

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status.

*Id.* at 573-76, 819 A.2d at 1043-45; *see also In re Adoption/Guardianship Nos. J9610436 and J9711031,* 368 Md. at 676-78, 796 A.2d at 783-85. This overall statutory scheme essentially has remained in place since this Court's description in 1994, notwithstanding various amendments to the provisions governing the child welfare system.

### 1. Permanency Planning for Children in Foster Care

■ The initial assessment in child placement where the State acts as *parens patriae,* is the development of a permanency plan by the Department of Social Services (DSS) "to set the direction in which the parent, agencies, and the court will work in terms of reaching a satisfactory conclusion to the situation." *In re Yve S.,* 373 Md. at 582, 819 A.2d at 1049. In developing a permanency plan DSS must adhere to the mandates enumerated in Section 5-525(e)(1) of the Family Law Article, which states:

*Development of a permanency plan.*—(1) In developing a permanency plan for a child in an out-of-home placement, the local department of social services shall give primary consideration to the best interests of the child. The local department shall consider the following factors in determining the permanency plan that is in the best interests of the child:

(i) the child's ability to be safe and healthy in the home of the child's parent;

(ii) the child's attachment and emotional ties to the child's natural parents and siblings.

(iii) the child's emotional attachment to the child's current caregiver and the caregiver's family;

(iv) the length of time the child has resided with the current caregiver;

(v) the potential emotional, developmental, and educational harm to the child if moved from the child's current placement; and

(vi) the potential harm to the child by remaining in State custody for an excessive period of time.

Md.Code (1984, 1999 Repl.Vol.), § 5–525(e)(1) of the Family Law Article. The statutory hierarchy of placement options that DSS should consider is set forth in Section 5–525(e)(2) of the Family Law Article, which provides:

To the extent consistent with the best interests of the child in an out-of-home placement, the local department shall consider the following permanency plans, in descending order of priority:

(i) returning the child to the child's parent or guardian, unless the department is the guardian;

(ii) placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted;

(iii) adoption in the following descending order of priority:

1. by a current foster parent with whom the child has resided continually for at least the 12 months prior to developing the permanency plan or for a sufficient length of time to have established positive relationships and family ties; or

2. by another approved adoptive family;

(iv) placing the child in a court approved permanent foster home with a specific caregiver;

(v) an independent living arrangement; or

(vi) long-term foster care.

Md.Code (1984, 1999 Repl.Vol.), § 5–525(e)(2) of the Family Law Article. Likewise, the role of the courts in ensuring that the appropriate permanency plan is implemented was described by this Court in *In re Damon M.*:

[T]he court has the responsibility for determining the permanency plan ... and justifying the placement of children in out of home placements for a specified period or on a long-term or permanent basis ... in addition to conducting periodic, six month reviews.

\* \* \*

Section 3–826.1 [now codified as Section 3–823 of the Courts and Judicial Proceedings Article] requires the court, not later than 11 months after a child found to be in need of assistance has been placed in foster care, *see also* Md.Code (1989, 1991 Repl.Vol., 1997 Cum.Supp.) § 501(m) of the Family Law Article, to hold a permanency planning hearing to determine the permanency plan for that child. § 3–826.1(a)(1) [now § 3–823(b)(1) ]. At that hearing, for each child in placement and in determining the plan, the court is required to make certain decisions and findings, § 3–826.1(c), [now § 3–823(e) ] specifically, whether the child should be: returned to the parent or guardian, § 3–826.1(c)(1)(I) [now § 3–823(e)(1)(I) ]; placed with relatives to whom adoption or guardianship is granted, § 3–826.1(c)(1)(ii) [now § 3–823(e)(1)(ii) ]; placed for adoption, § 3–826.1(c)(1)(iii) [now § 3–823(e)(1)(iii) ]; emancipated, § 3–826.1(c)(1)(iv) [now deleted]; or *"because of the child's*

*special needs or circumstances, continued in placement on a permanent or long-term basis or for a specified period."* § 3–826.1(c)(1)(v) and (vi) [now § 3–823(e)(1)(v) and (vi)]. *There are restrictions on the court's ability to continue a child in placement because of the child's special needs or circumstances.* § 3–826.1(d) [now § 3–823(f)]. *That section prohibits the court from using that option unless it finds that the agency to which the child is committed has documented a compelling reason for determining that it would not be in the best interest of the child to:*

*(1) Return home;*

*(2) Be referred for termination of parental rights; or*

*(3) Be placed for adoption or guardianship with a specified and appropriate relative or legal guardian willing to care for the child.'*

*Id.* at 432 n. 1, 765 A.2d at 625 n. 1 (some internal citations omitted) (emphasis added). We continued to explain:

Section 3–826.1(f) [now § 3–823(h)] mandates periodic reviews of the permanency plan by the court. Subsection (f)(1)(i) provides [now § 3–823(h)(1)(i)] that such reviews will be "no less frequently than every six months until commitment is rescinded." If, however, at the permanency planning hearing or a subsequent review hearing, the court, *inter alia,* orders a child continued in permanent foster care, the court is no longer required to hold the review hearings at six month intervals. Subsection (f)(1)(ii) [now § 3–823(h)(1)(ii), is revised to require review hearings every 12 months.]. As is true of the initial permanency planning hearing, the court must make some determinations at the hearing to review the permanency plan.

§ 3–826.1(f)(2) [now § 3–823(h)(2)]. Among other things, in addition to determining whether the commitment remains necessary and appropriate, subsection (f)(2)(i) [now § 3–823(h)(2)(i)], and evaluating the progress made toward alleviating or mitigating the causes of the commitment, subsection (f)(2)(iii) [now § 3–823(h)(2)(iii)], the court is required to "determine the extent of compliance with the

**308**

permanency plan," Subsection (f)(2)(ii) [now § 3–823(h)(2)(ii) ], and to change it "if a change in the permanency plan would be in the child's best interest." Subsection (f)(2)(v) [now § 3–823(h)(2)(vi) ].

*Id.*

A review of the legislative history of Section 3–826.1 of the Courts and Judicial Proceedings Article reveals that the stated purpose of the statute was to establish the court's ability to review the implementation of a permanency placement plan for children in need of assistance. *See* 1996 Md. Laws, Ch. 595. Previously, Section 3–826.1 provided that:

[t]he court shall:

(1) Determine the child's permanency plan, including whether the child should be:

(v) Because of the child's special needs or circumstances, *continued in placement on a permanent or long-term basis;* or

(vi) Because of the child's special needs or circumstances, continued in placement for a specified period.

Md.Code (1984, 1998 Repl.Vol.), § 3–826.1(c)(1)(v)–(vi) of the Courts and Judicial Proceedings Article (emphasis added). In 2001, Section 3–826.1 was repealed and recodified as Section 3–823 of the Courts and Judicial Proceedings Article, and the provisions relating to placement of children with special needs or circumstances were changed to read:

[t]he court shall:

(1) Determine the child's permanency plan, which may be:

(v) Continuation in a *specified placement on a permanent basis* because of the child's special needs or circumstances;

(vi) Continuation in placement for a specified period because of the child's special needs or circumstances.

*See* 2001 Md. Laws, Ch. 415 (emphasis added). Thus, the General Assembly replaced "long-term basis" with "continuation in a specified placement on a permanent basis," with a named care-giver.

## 2. Termination of Parental Rights

We have explained that the "adoption statutes of Family Law Subtitle 3 and the child welfare statutes of Family Law Subtitle 5 are to be read in relation to one another, [Maryland Code, Section 5–304 of the Family Law Article], [and] termination of parental rights and adoption come into play when called for by the permanency plan." *In re Adoption/Guardianship No. 10941*, 335 Md. at 121, 642 A.2d at 212. In cases where a child has been declared in need of the court's assistance, the decision leading to a termination of parental rights is necessarily part of a continuous process to determine the child's best interests and to place the child in a permanent and stable environment. The overlapping consideration that is reflected throughout the permanency planning stage of the process to the termination of parental rights is the safety and health of the child, which is of paramount importance. *See* Md.Code (1984, 1999 Repl.Vol.), § 5–525(e)(1)(i)–(iii) of the Family Law Article; Md.Code (1984, 2002 Repl.Vol.), § 3–823(h)(2)(v) of the Courts and Judicial Proceedings Article; Md.Code (1984, 1999 Repl.Vol.), § 5–313(c)(1) and (2)(iii) of the Family Law Article.

To prevent children from languishing in foster care the General Assembly established certain time frames to which DSS and the courts must adhere. In instances where the child's placement in foster care is voluntary, the placement should not last for more than six months. *See* Md.Code (1984, 1999 Repl.Vol.), § 5–525(a)(1) of the Family Law Article.[8]

---

8. Md.Code (1984, 1999 Repl.Vol.), § 5–525(a)(1) of the Family Law Article stated:

(a) *Established.*—The Administration shall establish a program of out-of-home placement for minor children:
(1) who are placed in the custody of a local department, for a period of not more than 6 months, by a parent or legal guardian under a written agreement voluntarily entered into with the local department[.]

This language was amended in 2003 to state 180 days rather than six months. *See* 2003 Session Laws, Ch. 250. In addition, the General Assembly added Sections 5–525(a)(2)(i) and (ii). Those sections per-

For children who have been in foster care during 15 of the most recent 22 months, DSS must initiate a termination of parental rights within 120 days. *See* Md.Code (1987, 1999 Repl.Vol.), § 5–525.1(a)–(b) of the Family Law Article.[9]　Once

---

tained to the length of time a child with disabilities may remain in foster care:

> A child ... may remain in an out-of-home placement under a voluntary placement agreement for more than 180 days if the child's disability necessitates care or treatment in the out-of-home placement and a juvenile court makes a finding that continuation of the placement is in the best interests of the child[.]

Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), § 5–525(a)(2)(ii) of the Family Law Article.

Likewise, Section 5–525(a)(2)(i) states:

> A local department may not seek legal custody of a child under a voluntary placement agreement if the child has a developmental disability or a mental illness and the purpose of the voluntary placement agreement is to obtain treatment or care related to the child's disability that the parent is unable to provide.

Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), § 5–525(a)(2)(i) of the Family Law Article.　To prevent a child with special needs from being separated from his or her family solely based upon the financial burdens related to caring for the child, Section 5–525(c)(2)(i) was amended to state:

> A child may not be committed to the custody or guardianship of a local department and placed in an out-of-home-placement solely because the child's parent or guardian lacks shelter or solely because the child's parents are financially unable to provide treatment or care for a child with a developmental disability or mental illness.

Md.Code (1984, 1999 Repl.Vol., 2003 Cum.Supp.), § 5–525(c)(2)(i) of the Family Law Article.

The purpose of the amendments was to, among other things, "prohibit a local department from seeking legal custody of a child with certain disabilities under certain circumstances;　authoriz[e] a child with certain disabilities to remain in an out-of-home placement for more than a specified period of time under certain circumstances;　prohibit[ ] a child from being committed to the custody or guardianship of a local department solely for certain reasons;　and generally relating to children with disabilities."　2003 Session Laws, Ch. 250.　These amendments certainly do not create different permanency goals for children with disabilities, and is reflected in the stated purpose of the changes and addition to the statutes.

9.　Md.Code (1984, 1999 Repl.Vol.), § 5–525.1 of the Family Law Article states in part:

> (a) *Determination of child's best interest.*—If a child placement agency to which a child is committed under § 5–525 of this subtitle determines that adoption of the child is in the best interest of the child, the child placement agency shall refer the case to the agency

the petition to terminate parental rights is filed, the "local department shall identify, recruit, process, and seek to approve a qualified family for adoption, guardianship, or other permanent placement." Md.Code (1987, 1999 Repl.Vol.), § 5-525.1(c) of the Family Law Article. If DSS determines that adoption is the appropriate permanency plan for a child, a petition for guardianship [10] may be filed by the child's placement agency, absent consent by the biological parents, to enable the child to be adopted. *See* Md.Code (1987, 1999 Repl.Vol.), § 5-525.1(a), (b) of the Family Law Article.[11]

---

attorney within 60 days of the determination and the agency attorney shall file a petition for termination of the natural parent's rights with the court within 60 days of receipt of the referral.

(b) *Termination of parental rights.*—(1) Except as provided in paragraph (3) of this subsection, a local department to which a child is committed under § 5-525 of this subtitle shall file a petition for termination of parental rights or join a termination of parental rights action that has been filed if:

(i) the child has been in an out-of-home placement for 15 of the most recent 22 months;

(ii) a court finds that the child is an abandoned infant; or

(iii) a court finds that the natural parent has been convicted . . .

10. " 'Guardianship' means guardianship with the right to consent to adoption or long-term care short of adoption." Md.Code (1984, 1999 Repl.Vol.), § 5-301 of the Family Law Article. Petitions for guardianship are filed pursuant to Md.Code (1984, 1999 Repl.Vol.), § 5-317 of the Family Law Article and reads in part:

(a) *In general.*—A petition for a decree of adoption may be preceded by a petition for guardianship of the child.

\* \* \*

(f) *Effect of guardianship decree.*—A decree of guardianship:

(1) terminates the natural parents' rights, duties, and obligations toward the child;

(2) subject to § 5-319 of this subtitle, eliminates the need to give notice to the natural parents of the filing of a petition for adoption of the child;

(3) eliminates the need for a further consent by the natural parents to an adoption of the child; and

(4) subject to § 5-319 of this subtitle, authorizes the child placement agency to consent to joint guardianship, custody, or other long-term placement that the agency determines to be in the child's best interest.

11. One anomaly in the statute is that the court retains the authority to review the adoption plan if the child has not been adopted within two years and may take whatever action the courts deems appropriate in

There may be instances, however, where adoption is not the appropriate permanency goal and placement on a long-term basis is more appropriate. Accordingly, the General Assembly has created three separate bases for long-term placement, rather than adoption: if the child is being cared for by a relative, if DSS has a compelling reason why termination of parental rights would not be in the child's best interests, or if DSS has not provided timely reunification services for the parent and child. *See* Md.Code (1987, 1999 Repl.Vol.), § 5-525.1(b)(3) of the Family Law Article.[12] These provisions

_____

the child's best interests, including placing the child in long-term care. *See* Md.Code (1984, 1999 Repl. Vol.), § 5-319 of the Family Law Article, which states in part:

(b) *In general.*—Except as provided in subsection (g) of this section, a guardian with the right to consent to adoption who was appointed without the consent of the natural parents, shall file a written report with the court and give notice of the child's status to each natural parent of the child under the guardianship and to the child's court-appointed counsel if:
(1) a placement for adoption is not made within 9 months of the decree of guardianship;
(2) a placement for adoption is made within 9 months of the decree of guardianship, but there is disrupted placement, and a new placement is not make within 120 days of the disrupted placement; or
(3) a final decree of adoption is not entered within 2 years after placement for adoption.

\*　　　\*　　　\*

(f) *Hearing; orders.*—On receipt of the guardian's report under subsection (b) of this section, and every 12 months thereafter, the court:
(1) shall hold a hearing to review the progress which has been made toward the child's adoption and to review whether the child's current placement and circumstances are in the child's best interest; and
(2) shall then take whatever action the court considers appropriate in the child's best interest.

12. Md.Code (1987, 1999 Repl.Vol.), § 5-525.1(b)(3) of the Family Law Article states:

A local department is not required to file a petition or join an action if:
(i) the child is being cared for by a relative;
(ii) the local department has documented in the case plan, which shall be available for court review, a compelling reason why termination of parental rights would not be in the child's best interests; or
(iii) the local department has not provided services to the family consistent with the time period in the local department's case plan

apply to all children in foster care and recognize that there could be compelling reasons for long-term placement without regard to whether the child has special needs.

To guide the court in deciding whether parental rights are to be terminated, Section 5–313 of the Family Law Article sets forth the standards a court must follow:

(a) *In general.*—A court may grant a decree of adoption or a decree of guardianship, without the consent of a natural parent otherwise required by §§ 5–311 and 5–317 of this subtitle, if the court finds by clear and convincing evidence that it is in the best interest[s] of the child to terminate the natural parent's rights as to the child and that:

(1) the child is abandoned as provided in subsection (b) of this section;

(2) in a prior juvenile proceeding, the child has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child; or

(3) the following set of circumstances exists:

(i) the child has been continuously out of the custody of the natural parent and in the custody of a child placement agency for at least 1 year;

(ii) the conditions that led to the separation from the natural parent still exist or similar conditions of a potentially harmful nature still exist;

(iii) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the natural parent in the immediate future; and

(iv) a continuation of the relationship between the natural parent and the child would diminish greatly the child's prospects for early integration into a stable and permanent family.

\* \* \*

that the local department considers necessary for the safe return of the child to the child's home.

(c) *Required considerations.*—In determining whether it is in the best interest[s] of the child to terminate a natural parent's rights as to the child in any case, except the case of an abandoned child, the court shall give:

(1) primary consideration to the safety and health of the child; and

(2) consideration to:

(i) the timeliness, nature, and extent of the services offered by the child placement agency to facilitate reunion of the child with the natural parent;

(ii) any social service agreement between the natural parent and the child placement agency, and the extent to which all parties have fulfilled their obligations under the agreement;

(iii) the child's feelings toward and emotional ties with the child's natural parents, the child's siblings, and any other individuals who may significantly affect the child's best interest;

(iv) the child's adjustment to home, school, and community;

(v) the result of the effort the natural parent has made to adjust the natural parent's circumstances, conduct, or conditions to make it in the best interest of the child to be returned to the natural parent's home, including:

1. the extent to which the natural parent has maintained regular contact with the child under a plan to reunite the child with the natural parent, but the court may not give significant weight to any incidental visit, communication, or contribution;

2. if the natural parent is financially able, the payment of a reasonable part of the child's substitute physical care and maintenance;

3. the maintenance of regular communication by the natural parent with the custodian of the child; and

4. whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the natural parent within an ascertainable

time, not exceeding 18 months from the time of placement, but the court may not consider whether the maintenance of the parent-child relationship may serve as an inducement for the natural parent's rehabilitation; and

(vi) all services offered to the natural parent before the placement of the child, whether offered by the agency to which the child is committed or by other agencies or professionals.

(d) *Considerations following juvenile adjudication.*—(1) In determining whether it is in the best interest of the child to terminate a natural parent's rights as to the child in a case involving a child who has been adjudicated to be a child in need of assistance, a neglected child, an abused child, or a dependent child, the court shall consider the factors in subsection (c)of this section and whether any of the following continuing or serious conditions or acts exist:

(i) the natural parent has a disability that renders the natural parent consistently unable to care for the immediate and ongoing physical or psychological needs of the child for long periods of time;

(ii) the natural parent has committed acts of abuse or neglect toward any child in the family;

(iii) the natural parent has failed repeatedly to give the child adequate food, clothing, shelter, and education or any other care or control necessary for the child's physical, mental, or emotional health, even though the natural parent is physically and financially able;

(iv) 1. the child was born:

A. addicted to or dependent on cocaine, heroin, or a derivative thereof; or

B. with a significant presence of cocaine, heroin, or a derivative thereof in the child's blood as evidenced by toxicology or other appropriate tests; and

2. the natural parent refuses admission into a drug treatment program or failed to fully participate in a drug treatment program. . . .

Md.Code (1984, 1999 Repl.Vol.), § 5–313 of the Family Law Article.

We have consistently acknowledged that the court's power to terminate parental rights in cases involving the State, is grounded in statute. *See Carroll County Dep't. of Social Services v. Edelmann,* 320 Md. 150, 175, 577 A.2d 14, 26 (1990). In such cases, under Section 5–313(a), a court may terminate parental rights, without consent, upon a finding by clear and convincing evidence, that termination is in the best interests of the child *and* one of three circumstances exist: the child has been abandoned; in a prior proceeding the child was adjudicated a child in need of assistance; *or* certain circumstances warranted a termination of parental rights. Md.Code (1984, 1999 Repl.Vol.), § 5–313(a) of the Family Law Article.[13]

In this case, the Court of Special Appeals remanded the case to have the trial court make additional factual findings to determine whether Victor A.'s prospects for permanent placement with an adoptive family would be diminished by continuing Mr. A. and Ms. A.'s parental rights, as provided in Section 5–313(a)(3)(iv) of the Family Law Article. PGDSS, in its petition before this Court, suggests, however, that the issue of Victor A.'s likelihood of adoption was not an appropriate inquiry by the Court of Special Appeals.[14] Nevertheless,

---

13. Specifically, Section 5–313(a)(3) states:
> (3) the following set of circumstances exists:
> (i) the child has been continuously out of the custody of the natural parent and in the custody of a child placement agency for at least 1 year;
> (ii) the conditions that led to the separation from the natural parent still exist or similar conditions of a potentially harmful nature still exist;
> (iii) there is little likelihood that those conditions will be remedied at an early date so that the child can be returned to the natural parent in the immediate future; and
> *(iv) a continuation of the relationship between the natural parent and the child would diminish greatly the child's prospects for early integration into a stable and permanent family.*
>
> Md.Code (1984, 1999 Repl.Vol.), § 5–313(a)(3) of the Family Law Article (emphasis added).

14. Mr. A. and Ms. A. presented the following question for review in the Court of Special Appeals:

although the A.'s did not expressly challenge the trial court's findings under Section 5–313(a), they did argue in their appeal that the trial court was incorrect in finding their parental rights should be terminated. Subsumed within that question was whether the trial court adequately addressed all of the required factors of Section 5–313 of the Family Law Article, which, as we have stated, governs the decision to terminate parental rights.

 In his findings during the termination hearing, the trial judge acknowledged that "Victor A. [had been] adjudicated a CINA previously ..." under Section 5–313(a)(2), but also addressed whether circumstances warranted a termination of parental rights under Section 5–313(a)(3) of the statute. The plain language of Section 5–313(a), however, indicates that once the trial judge had determined that Victor A. was a CINA, he need not have addressed any of the additional circumstances construed in Section 5–313(a)(3), but should have proceeded to the required findings under Sections 5–313(c) and (d). *See In re Adoption/Guardianship No. 10941,* 335 Md. at 112, 642 A.2d at 208; *In re Adoption/Guardianship No. 87A262,* 323 Md. 12, 18, 590 A.2d 165, 168 (1991). We, therefore, conclude that trial court in this instance was not required to assess whether Victor A.'s chances for permanent placement with a family would be diminished by continuation of Mr. A. and Ms. A.'s parental rights under Section 5–313(a)(3).

We have held, heretofore, that a child's prospects for adoption must be a consideration independent from the termination of parental rights, *see Cecil County Dept. of Soc. Servs. v. Goodyear,* 263 Md. 611, 615, 284 A.2d 426, 428 (1971), in that "[t]he facts should first be considered as if the State were taking the child from the parent for some indefinite placement and upon that determination open the question of the suitability of the proposed adoption and its relation to the child's welfare." *Id.* at 616–17, 284 A.2d at 428; *see also Winter v.*

---

Did the trial court err in terminating both Mr. A.'s and Mrs. A.'s parental rights of their son, Victor?

318

*Director, Dept. of Public Welfare of Baltimore City,* 217 Md. 391, 394, 143 A.2d 81, 83 (1958), *cert. denied* 358 U.S. 912, 79 S.Ct. 242, 3 L.Ed.2d 233 (1958) (holding that adoption may be considered only "after a hearing the court finds that such consent or consents [to adoption] are withheld contrary to the best interests of the child.").

■ Whether children with special needs are subject to a different legal standard in the determination of their best interests is the next question we address and conclude that none of the relevant statutes defining the child welfare system nor cases interpreting those sections suggests that a different standard should apply for the placement of children with special needs or for the decision concerning whether the rights of their parents should be terminated.[15] Although Section 3–823(e) of the Courts and Judicial Proceedings Article permits children with special needs or circumstances to remain in long-term placement on a permanent basis, no analogous provision regarding special needs exists in the termination of parental rights statute. Stated otherwise, while the trial judge may consider long-term placement options for children with special needs, the existence of special needs does not independently enter into the court's decision whether to terminate parental rights.[16] To the extent that the opinion of the Court of Special Appeals states otherwise, we disagree.

■ In the present case, in the absence of sufficient findings, the Court of Special Appeals ordered a remand of the case to have the trial court explain why termination of Mr. A. and Ms. A.'s parental rights would be in Victor A.'s best

---

15. A court should address whether the biological parent has a disability that renders him or her incapable of caring for the child, but such a determination would apply to every child in the foster care system declared to be in need of the court's assistance. *See* Md.Code (1984, 1999 Repl.Vol.), § 5–313(d)(1)(i) of the Family Law Article.

16. The Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* (1990), which prohibits discrimination against individuals with disabilities, is not implicated in the case *sub judice* based upon our holding that the provisions governing the child welfare system do not create different standards for children with disabilities.

interests and thereby, to make the requisite findings in support of any decision to terminate Mr. A. and Ms. A.'s rights based upon Sections 5–313(c) and (d) of the Family Law Article in the best interests of Victor A.[17] We agree. Upon remand, the trial court must address each of the required considerations of Sections 513(c) and (d) and make specific findings as to each of the factors identified in the statute prior to a decision whether to terminate the parental rights of Mr. and Ms. A.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS MODIFIED TO PROVIDE THAT THE CASE IS RE-*

---

**17.** Consistent with this view, courts of other jurisdictions have held that the best interests standard continues to guide the decision to terminate the parental rights of parents who have children with special needs in which the State has intervened in its role as *parens patriae*. *See In re Guardianship of Etajawa A.*, 304 A.D.2d 477, 759 N.Y.S.2d 35, 37 (N.Y.App.Div.2003) (concluding that the best interests of the child were served by terminating parental rights because the biological mother had failed to acquire the parenting skills necessary to care for the child); *In the Matter of Alex Ostrer*, 172 Or.App. 571, 19 P.3d 980, 986 (2001) (holding that it was in the child's best interests to terminate the mother's parental rights because she was unfit to care for her child with severe emotional and behavioral problems); *In re Jon N.*, 754 A.2d 346, 348–50 (Me.2000) (determining that the child's best interests were served by terminating the mother's parental rights because she was unable to care for the child's special needs); *Adoption of Warren*, 44 Mass.App.Ct. 620, 693 N.E.2d 1021, 1026 (1998) (finding that "[t]he specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness" to determine the best interests of a child in a termination of parental rights hearing); *In re Interest of Constance G.*, 254 Neb. 96, 575 N.W.2d 133, 142 (1998) (holding that child's special needs due to emotional and behavioral problems "in and of itself does not provide a basis for terminating the father's parental rights;" rather such a determination must be based upon the best interests of the child); *Shaw v. Shelby County Dept. of Public Welfare*, 584 N.E.2d 595, 600–01 (Ind.App.1992) (concluding that termination of parental rights of child with behavioral difficulties was in the best interests of the child because of the parent's inability to care for the child's special needs); *In the Interest of S.J.*, 451 N.W.2d 827, 830–31 (Iowa 1990) (determining that best interest of child with severe learning and behavioral disability would not be served by terminating mother's parental rights); *In re Interest of S.P.W.*, 761 S.W.2d 193, 198 (Mo.App. 1988) (finding that termination of parental rights would protect children's best interests because mother was unable to care her children with emotional and physical problems).

**320**

*MANDED TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION, AND, AS MODIFIED, THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.*