CECIL COUNTY DEPARTMENT OF SOCIAL
SERVICES *v.* GOODYEAR ET UX.

[No. 94, September Term, 1971.]

*Decided December 9, 1971.*

**612**

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ.

*Judson P. Garrett, Jr., Special Assistant Attorney General,* and *William B. Calvert* for appellant.

*Edwin B. Fockler, III,* for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

Two centuries ago Thomas Gray, in his Elegy, spoke of the "short and simple annals of the poor." The annals of the appellees, however, are neither short nor simple, a clear indication that times have changed. Indeed, this episode alone has generated a rather plump dossier.

In October 1969 the appellant (Department) asked the Circuit Court for Cecil County to appoint it the legal guardian of Richard Lee Goodyear (Rickie), born 22 April 1966, with the right to consent to his adoption, as provided by Code (1966 Repl. Vol.), Art. 16, § 72.[1] The case came on for trial in January 1970 before Mackey, J. Two case workers and the appellees (the Goodyears) gave testimony and there were received into evidence some 85 pages of case history. Shortly there-

---

1. Now Code (1971 Cum. Supp.), Art. 16, § 72 (a). Recent amendments, effected by the Acts of 1967, Ch. 501, and the Acts of 1970, Ch. 144, are immaterial in the context of the instant case.

after the chancellor appointed the Department guardian of Rickie with the right to consent to his adoption or to arrange for long term care short of adoption, as provided by § 72 (b). He gave the Department the right also to change Rickie's name, "when it is desirable." The Goodyears' appeal to the Court of Special Appeals was successful. The decree of the chancellor was reversed; a few months later the Department's motion for reargument was denied. *Goodyear v. Cecil County Department of Social Services,* 11 Md. App. 280 (1971). We granted certiorari on 31 May 1971.

After reciting many relevant facts, Judge Morton, who wrote for the Court of Special Appeals, went on to say:

> "In the case at bar, the lower court, apparently, based its finding that the appellants withheld their consent against the best interests of their child on the ground that they were unfit parents. There was ample evidence before the court that the relationship between the appellants was extremely unstable. The record reveals that the Goodyears have separated and reunited on numerous occasions after having arguments in their home. They have sworn out warrants for each other's arrest on more than one occasion and have consistently blamed each other for the problems they have experienced. Moreover, since Richard's birth, they have lived in a number of different locations both inside and outside Maryland. Mrs. Goodyear filed for divorce on the grounds of adultery but later dismissed the proceeding.
>
> "The two social workers who testified at trial felt that the prognosis for the future stability of the Goodyear household was very poor in light of these problems and that the appellants would be unable to solve the problems by themselves. They also stated that the appellants often discussed their problems in front of Rich-

ard during their visits with him and that this was harmful to the child.

"However, one of the social workers, when asked at the hearing if the Department of Social Services had any tentative plans for Richard's future, stated: 'We have adoptive parents, adoptive applicants, and generally try to match the background of the child, his potential, with the potential of the adoptive parents' home. *And this is a process that can take anywhere from, you know, one month to six months to a year, depending on if the child is highly adoptable.'*

"It is apparent, therefore, that with the exception of terminating the parent-child visits, which were described as harmful to the child, *no affirmative plans have been formulated by the appellee to create a favorable and permanent environment for Richard which might be measured or compared with the resulting loss of all ties with his natural parents.* Under the present proposal of the appellee, Richard could conceivably remain in his present foster home for a year or longer while adoptive parents are being sought. * * *."

\* \* \*

"We do not have a situation where the child to be adopted has been in the custody of individuals seeking his adoption or exposed to them in a manner which would engender feelings of love, affection and emotional attachment toward them. *Nor do we know or have any conception of the type of parents, environment or surroundings which will be provided Richard in any proposed future adoptive home which could form a basis for a determination that it would be in Richard's best interest to be taken permanently from his natural parents.* * * *.

"In effect the court below concluded that the instability of the appellants, admittedly severe in the past and not hopeful of correction in the future, was sufficient to justify a permanent severance of Richard's ties with his natural parents, who loved him and were financially able and willing to support him, *at a time when the family into which he was to be adopted was as yet an unknown quantity.*" *Id.* at 284-86. (All emphases supplied.)

The court seems to be saying that before a decree contemplated by § 72 can be passed there must be a showing that the character, stability, security, environment, life style and home life of the persons who are to become the adoptive parents compare favorably with those of the natural parents of the child. This seems to run counter to our holding in *Winter v. Director of the Department of Public Welfare of Baltimore City*, 217 Md. 391 (1958) *cert. denied* 358 U. S. 912 (1958). There Judge Prescott (later Chief Judge), said, for the Court:

"It [§ 72] must be considered in conjunction with the other sections relating to adoptions, and, especially, with that part of section 74 which provides that the court may grant a petition for adoption *without* parental consent, 'if, after a hearing the court finds that such consent or consents are withheld *contrary to the best interests of the child.*' (Italics added.)" *Id.* at 394.

"It may be noted that while section 72 contemplates a future adoption, it provides only for an authorization to the guardian to consent to such an adoption. *This is forward looking social legislation that provides for the future welfare of children, and, in some situations, is extremely important.* Under certain circumstances, it becomes of vital importance to

a child's life that a parent be unacquainted with the identity of the one who adopts his child. Especially is this so when the parent has demonstrated his complete unfitness, or lack of desire, to care for the child. *If such a parent does not know the adopting parents of his child, it may eliminate many possible disturbances of the child's future welfare, which, otherwise, conceivably could be disastrous.* Delaware (Title 13 Del. Code, secs. 1103-1110), Wisconsin (Wisconsin Statutes N. W. 48.40-48.43) and perhaps other states have enacted similar statutes, and such legislation is strongly recommended by the Children's Bureau of the Social Security Administration of the Federal Security Agency. See its publication No. 331, *Essentials of Adoption Law and Procedure,* (1949) p. 7. We have no hesitancy in holding that said section 72 of Article 16 (Code 1957) does not abridge any privileges or immunities guaranteed under the fourteenth amendment to the federal constitution." *Id.* at 396-97. (Emphases added.)

Simpson's comment in *The Unfit Parent: Conditions Under Which a Child May Be Adopted Without the Consent of His Parents,* 39 U. of Det. L. J. 347 (1962), is fairly representative of the direction recent statutes and decisions have taken. She said:

"Confusion sometimes arises in these cases because there is a natural tendency to compare the two homes and the parties, but such comparison is entirely irrelevant. That both issues are decided in one case leads to some confusion. The facts should first be considered as if the State were taking the child from the parent for some indefinite placement and upon that determination open the question of the suitability of the proposed adoption and its relation to the

child's welfare. *The radically different issues involved have led to demand for statutes to terminate parental rights in a judicial proceedings prior to the adoption hearing." Id.* at 359. (Emphasis added.)

"The growing trend is for states to adopt termination of parental rights statutes requiring or permitting parental rights to be determined in this particular proceeding before adoption without consent of the parent is applied for, thus separating the issues so that they may be examined more objectively." *Id.* at 367.

"Another advantage of termination of parental rights statutes is that the natural parents have no way of knowing where the child is or who the adoptive parents are." *Id.* at 368.

See also *Termination of Parental Rights to Free Child for Adoption,* 32 N.Y.U. L. Rev. 579, 582 (1957); Note, *Child Abandonment: The Botched Beginning of the Adoption Process,* 60 Yale L. J. 1240 (1951); United States Children's Bureau, *Legislative Guides for the Termination of Parental Rights and Responsibilities and the Adoption of Children* 61 (Pub. No. 394, 1961); United States Children's Bureau, *Essentials of Adoption Law and Procedure* 7 (Pub. No. 331, 1949).

In *Palmisano v. Baltimore County Welfare Board,* 249 Md. 94 (1968) *cert. denied,* 393 U. S. 853 (1968), the Board sought and was granted guardianship with the right to consent to adoption. More than a year later the Board consented to the adoption of its ward by the foster parents. The decree of adoption was attacked by the natural parents and the parents of the child's natural mother. We affirmed the chancellor's refusal to reopen the decree granting the Board guardianship with the right to consent to adoption. The concluding comment of Judge Finan, who delivered the opinion of the Court, is peculiarly significant here:

"This Court is well aware that its decision has permanently separated a child from her natural parents, who are now in a position to accept her as their own. It realizes that as time goes by, these young parents may be haunted by the realization that, just a few miles away, their daughter is growing up in another home with people she will look upon as her father and mother. However, to do otherwise, this Court would be dissolving the foundation underlying all adoptions, the need to surround the final decree with a high degree of certainty. Society looks upon adoption as a salutary and uplifting humane act. The general welfare of the State is enriched by its use. It provides countless foundlings with an opportunity for a normal childhood which otherwise they might not have. Anything which would undermine public confidence in adoption procedures must be viewed by the courts in the gravest light.

"*We deem it unfortunate that Judge Day by verbal order and Judge Dyer subsequently by written order, directed that the adoption proceedings in Harford County be unsealed for inspection by the natural parents and their attorneys, thus revealing the name and address of the adoptive parents.* Adoption laws were formulated in anticipation of emotional controversy and were designed to avoid it, as much as possible, by safeguarding the rights of both the natural as well as the adoptive parents." *Id.* at 103. (Emphasis added.)

The Court of Special Appeals was satisfied that the evidence before the chancellor "was sufficient to support a finding that * * * [Rickie's] best interest would be served by his remaining in the foster home for the present time * * *." We are not persuaded, however, as was the Court of Special Appeals, that the record "falls

far short of justifying the drastic result of permanently terminating * * * [the Goodyears'] parental rights * * *." We expressed our reluctance to disturb the findings of the chancellor in *Trudeau v. Trudeau,* 204 Md. 214, 218 (1954). There Judge Hammond (now Chief Judge) said, for the Court:

> "The over-riding consideration is the best interest and welfare of the children. The cases have described the search for this result as the main, the chief, the paramount, and the sole concern of the courts in every case. *Miller v. Miller, supra,* at page 407 of 191 Md.; *Cullotta v. Cullotta, supra,* at page 384 of 193 Md.; *Chillemi v. Chillemi,* 197 Md. 257, 262; and *In Re Harris,* 200 Md. 300, 310. Thus, whatever paths of the maze are followed, the destination is always the child's welfare and prospects. Even as no will has a twin, no custody matter is the image of another and in none can the proper paths be plotted automatically on a map of the principles laid down by the cases. This is why the opinions of this Court reiterate, as particularly applicable, the rule that the opportunity of the Chancellor to see and hear the witnesses must be accorded the greatest respect. It was set forth in *Cullotta v. Cullotta, supra,* in these words: 'This case is another of those in which the atmosphere of the trial, the appearance and demeanor of the witnesses is invaluable in reaching a correct and just conclusion. If the record in this case left us in doubt, we should not disturb his findings.' In many cases, this Court has said it will bow to the trial finding unless compelling reasons required otherwise."

To the same effect *see Beltran v. Heim,* 248 Md. 397, 401 (1968); *In re Malmstedt,* 243 Md. 92, 96 (1966) *cert. denied,* 385 U. S. 976 (1966); *Raible v. Raible,* 242 Md.

586, 593 (1966) ; *Andrews v. Andrews*, 242 Md. 143, 154 (1966).

That the chancellor was acutely aware of the burden of decision thrust upon him is clear from what he said:

"Obviously, this permanent severing of the natural ties and denying permanently the right of the natural parents to associate with their own flesh and blood is a matter of the most serious consequence or most serious aspect, and requires the strongest sort of showing that it is in the best interests of the child, which let me emphasize is the controlling consideration as opposed to the desires of the natural parents."

He discussed the facts in considerable detail. What follows are excerpts from his opinion:

"This child was born out of wedlock and subsequent to birth the natural mother was divorced from her then husband and when the child was one year old and in just a month after it had gone into foster care for the first time the couple were married, and the natural father commenced adoption proceedings, which apparently were never consummated.

"The father is 47, the mother is 43. This is the third marriage for the father and the second marriage for the mother. The mother has raised eight other children and the father has had one son who is now 22 years of age. The mother has custody of none of the other children, although there are three, ages 14, 13 and 11, who apparently are in the custody of the natural father and a new wife."

\* \* \*

"It develops at the hearing today that the couple have had a very stormy year. They were in fact separated last January at the time of the hearing, a fact the Court apparently was not

aware of then, but in any case in March, 1969 they were reunited for one week. On the 28th of March, 1969 there were warrants each gotten for the other, and they again separated. One warrant was for trespassing and the other for disorderly conduct. One or both claimed there to have been no substance to these warrants.

"In any event, by April 29, 1969 they were reunited and moved to a home at 224½ Hollingsworth Street or Hollingsworth Avenue in Elkton Heights. Then just about 33 or four days later, on June 2, 1969, they separated and some separation papers were drawn up by an attorney. At the same time there was an assault and battery warrant gotten by the wife against the husband for pulling a knife on her, which fact he denies and says that the real trouble was that she had cut herself after locking herself in the bathroom."

\* \* \*

"The Department of Social Services believes that this child should be removed from the home because there is no stable plan for the child, and because there seems to be no solution to their own problems. The Department claims that the visits with the child are damaging because the time is consumed too often discussing their own personal problems in the presence of the child; the separation, the alleged knife attack, and other matters were discussed, according to witness Mary Koszela of the Department."

\* \* \*

"It is the summary of the position of the Department that these parents are unfit by reason of instability, emotional or otherwise. One social worker characterized their relationship inter sese as being a love-hate relationship, in which they love each other for a while appar-

ently and then hate each other for a while, and they consequently have this on again off again, so they are separated for a while, live together for a while, and this situation appears to have existed for at least the last three years, which would encompass almost the entire life of the present marriage."

Our study of the whole record has persuaded us there is quite enough evidence to support the chancellor's findings and, as we have said, the greatest respect must be accorded the opportunity he had to see and hear the witnesses and to observe their appearance and demeanor. To paraphrase what was said in *Cullotta, supra,* even were we in doubt in respect of the correctness and the justice of his conclusion we would not disturb his findings. It comforts us, therefore, to be able to say that we entertain no such doubts.

*Judgment of the Court of Special Appeals reversed. Costs to be paid by appellees.*