12 A.3d 130

### In re ADOPTION/GUARDIANSHIP OF AMBER R. and Mark R.

No. 134, Sept. Term, 2009.

Court of Appeals of Maryland.

Jan. 24, 2011.

702

Tamara D. Sanders, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for petitioner.

Leslie K. Ridgway, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondents.

Chandra M. Quaye (Lazarus & Burt, P.A., Baltimore, MD), on brief, for respondents.

Argued before HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS, BARBERA and JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

ADKINS, J.

In this termination of parental rights case, a mother asks us to reduce to a simple formula the multifaceted statutory criteria for termination, and to hold that the trial court improperly shifted unto her the burden of proving her qualifications as a parent. Petitioner Cathy F. ("Ms. F.") is the parent of Respondents Amber R. and Mark R. (the "Children"), who have each been adjudicated to be a Child in Need of Assistance ("CINA") [1] by the Circuit Court for Baltimore City. Ms. F.'s long history of substance abuse and employment and housing issues led Respondent the Baltimore City Depart-

---

**1.** A Child in Need of Assistance ("CINA") is defined as:

[A] child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

Md.Code (1974, 2006 Repl.Vol.), § 3–801(f) of the Courts & Judicial Proceedings Article ("CJP"). Ms. F. does not contest the Children's CINA status in this appeal.

ment of Social Services (the "Department") to intervene in her family situation.

Ultimately, Ms. F. was unable to stabilize her home life, prompting the Department to pursue guardianship of the Children. The juvenile court, in evaluating Ms. F.'s fitness as a parent, found by clear and convincing evidence that she was an unfit mother, and that it would be in the Children's best interests to terminate her parental rights. The Court of Special Appeals affirmed this judgment. We granted certiorari to consider the following question:

> In a Termination of Parental Rights case, where the court does not make a finding that exceptional circumstances exist to warrant terminating a natural parent's right in [her] child, what level of parental unfitness is required to permanently sever the parent[-]child relationship?

We shall hold that the existing statutory scheme governing termination of parental rights ("TPR") cases sufficiently evaluates parental fitness, and that the juvenile court did not improperly shift the burden unto Ms. F.

## FACTS AND LEGAL PROCEEDINGS

In mid September 2005, Ms. F. and the Children were evicted from their home and began living with a non-relative in a house that lacked functioning utilities. At that time, Amber was two-years-old, and Mark was less than one-year-old. The eviction grabbed the attention of the Department and led to an Emergency Shelter Care hearing approximately two weeks later, attended by both Ms. F. and the Children's father, Mark R., Sr. ("Mr. R."). The juvenile court found that the children could not be returned to the parents because of the parents' chaotic lifestyle, their failure to care for the children, and Ms. F.'s continued drug use.[2] Thus, the Depart-

---

**2.** One month after her eviction, Ms. F. was admitted to a hospital rehabilitation program for Benzodiazepine and Heroin dependency. The hospital recommended that she undergo counseling and drug treatment education, as well as adopt a relapse prevention plan.

ment placed the Children in shelter care.[3]

In late April 2006, another hearing was held to determine the Children's status. Ms. F. did not attend. Mr. R. was present at the hearing, but he remained unable to provide longterm care for the Children due to his incarceration. The juvenile court determined that Amber and Mark were each a CINA, and committed the Children to the Department. Following the CINA adjudications, the Children were placed in a foster home, although the court established a permanency plan of parental reunification.

In order to facilitate parental reunification with the Children, the Department designed several service agreements directing Ms. F. to attend substance abuse treatment and parenting classes, apply for employment, and secure stable housing.[4] The Department also referred Ms. F. to drug treatment programs, parenting classes,[5] job skills classes, housing assistance, and supervised visitation assistance. Ms. F., however, did not complete any agreed-upon drug treatment program, and failed to provide the Department with any documentation indicating that she had completed substance abuse treatment or was participating in required drug testing. Case plans over the next 16 months indicated that Ms. F. still had "not met the terms of her service agreement[s]."

Ms. F.'s repeated failure to demonstrate that she had resolved her drug and housing problems led the Department to change the Children's permanency plan from "reunification" to "relative placement or adoption" after fifteen months of foster care. In July 2007, the Department filed a Petition for

---

3. "Shelter care" is defined as "a temporary placement of a child outside of the home" prior to a determination of whether judicial intervention is necessary to protect the child. *See* CJP § 3–801(y).

4. Ms. F. signed an Initial Service Agreement on November 18, 2005. The parents had previously signed other service agreements with the Department, but failed to comply with the terms of those agreements.

5. One social worker assigned to Ms. F. testified that she believed Ms. F. had completed parenting classes in the past, in connection with another matter, either in 2002 or 2005.

Guardianship with the Circuit Court, and the matter proceeded to a Termination of Parental Rights ("TPR") hearing in October 2008. At the time of that hearing, the Children had been living with their foster family, Mr. and Ms. Fa., since March of 2007. According to the Children's social worker, Ophelia Okafor, the Children had developed a substantial emotional attachment to the Fas. This was evidenced in part by the fact that they referred to Mr. and Ms. Fa. as "Mom and Dad," whereas they called their mother "Ms. [C]athy." The Fas were willing to adopt the Children.

At the TPR hearing, Detry Smith, a social worker who had personally supervised most of the visits between the Children and Ms. F., testified that the Children had apparently adjusted well to their new home. According to Smith, the age-inappropriate sexual behavior displayed by Amber at the time of her placement had since abated during her time with the Fas. She was now performing well in school, "ahead of most children her age." Amber did, however, experience significant anxiety related to the supervised visits with her biological mother, for which she received weekly therapy. Moreover, for "a day or two" after the visits, Amber was "very hard to control [and] . . . need[ed] to be reassured that she [would] be staying with the [Fas], that she's not being taken away." Smith further testified that the Fas would administer anti-anxiety medication to Amber following the visits, as recommended and supervised by a psychiatrist.

With regard to Ms. F., Okafor testified that the Children's mother had a history of substance abuse, lacked stable housing, and had "some problems with income." She further testified that Ms. F. claimed to have taken steps towards remedying her personal problems, including receiving treatment for her substance abuse problem and obtaining new housing, but was unwilling to provide corroborating information to Okafor so that these alleged steps could be verified. Okafor attempted to contact the drug treatment program in which Ms. F. was allegedly enrolled, but received no information from the program or Ms. F. At the hearing, Ms. F. admitted to using "heroin in the past[,]" but claimed that she

had been clean since November 11, 2006. When cross-examined, however, Ms. F. changed that date to November 11, 2005.

The juvenile court, after considering the testimony of Okafor, Smith, and Ms. F., as well as the available documentary evidence, found clear and convincing evidence that Ms. F. was "unfit to be a parent[,]" and that it was in the Children's best interests to terminate Ms. F.'s parental rights. In passing judgment, the court addressed each of the required statutory factors in turn and found that Ms. F.'s history of substance abuse and failure to remedy that issue to be of paramount importance in evaluating her fitness as a parent. Ms. F. appealed the juvenile court's decision to the Court of Special Appeals, which affirmed the ruling below. In an unreported opinion, the intermediate appellate court held that "the [juvenile court] had more than sufficient evidence upon which to terminate Ms. F.'s parental rights." This Court granted Ms. F.'s Petition for a Writ of Certiorari.[6]

## DISCUSSION

Ms. F. both proposes that we superimpose a four-factor test onto the statutory scheme governing termination of parental rights and challenges the juvenile court's application of the existing scheme to her case. In order to review the juvenile court's judgment, we must first lay out the relevant provisions of the Family Law Article, and then consider how those provisions were applied in this case. On review of an order to terminate parental rights, this Court uses a clearly erroneous standard when scrutinizing a trial court's factual findings. *See, e.g., In re Adoption/Guardianship of Victor A.*, 386 Md. 288, 297, 872 A.2d 662, 667 (2005) (*quoting In re Yve S.*, 373 Md. 551, 586, 819 A.2d 1030, 1051 (2003)). Review of the trial court's conclusions of law, however, will be conducted de novo. *See, e.g., In re Karl H.*, 394 Md. 402, 411, 906 A.2d 898, 903 (2006).

---

6. *In re Adoption of Amber R.*, 411 Md. 598, 984 A.2d 243 (2009).

*A. The Statutory Scheme Governing Termination of Parental Rights*

 In TPR cases, a parent's right to custody of his or her children "must be balanced against the fundamental right and responsibility of the State to protect children, who cannot protect themselves, from abuse and neglect." *In re Adoption/Guardianship of Rashawn H.*, 402 Md. 477, 497, 937 A.2d 177, 189 (2007). Thus, this parental right is terminated "upon a showing either that the parent is 'unfit' or that 'exceptional circumstances' exist which would make continued custody with the parent detrimental to the best interest of the child." *Id.* at 495, 937 A.2d at 188.

With this understanding, the General Assembly has set forth criteria to guide and limit the court in determining the child's best interest. *See* Md.Code (1984, 2006 Repl.Vol.), § 5–323 of the Family Law Article ("FL"); *Rashawn*, 402 Md. at 499, 937 A.2d at 190 (the statutory factors "circumscribe[ ] the near-boundless discretion that courts have in ordinary custody cases to determine what is in the child's best interest."). Section 5–323 enumerates a series of specific factors that a juvenile court must consider in any TPR proceeding.[7]

---

7. These provisions include the following:

> [A] juvenile court shall give primary consideration to the health and safety of the child and consideration to all other factors needed to determine whether terminating a parent's rights is in the child's best interests, including:
> (1)(i) all services offered to the parent before the child's placement,
> . . .
> (ii) the extent, nature, and timeliness of services offered ... to facilitate reunion of the child and parent; and
> (iii) the extent to which a local department and parent have fulfilled their obligations under a social services agreement, if any;
> (2) the results of the parent's effort to adjust the parent's circumstances ... to make it in the child's best interests for the child to be returned to the parent's home, including:
> (i) [the extent to which the parent has maintained regular contact with the child, local department to which the child is committed, and the child's caregiver];
> (ii) the parent's contribution to a reasonable part of the child's care and support, if the parent is financially able to do so;

At the time of the hearing in this case, Section 5–323(b) granted juvenile courts termination authority as follows:

> *Authority.*—If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that terminating the rights of a parent **is in a child's best interests,** the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

FL § 5–323(b) (emphasis added).[8] The statute thus establishes that, in TPR proceedings, the court's main concern is

---

(iii) the existence of a parental disability that makes the parent consistently unable to care for the child's immediate and ongoing physical or psychological needs for long periods of time; and

(iv) whether additional services would be likely to bring about a lasting parental adjustment so that the child could be returned to the parent within ... 18 months from the date of placement unless the juvenile court makes a specific finding that it is in the child's best interest to extend the time for a specified period;

(3) whether:

(i) the parent has abused or neglected the child or a minor and the seriousness of the abuse or neglect;

\* \* \*

(ii) 2. the mother refused the level of drug treatment recommended by a qualified addictions specialist ...

(iii) the parent subjected the child to [chronic abuse, chronic and life-threatening neglect, sexual abuse, or torture];

(iv) the parent has been convicted ... of [certain domestic violence crimes]; and

(v) the parent has involuntarily lost parental rights to a sibling of the child; and

(4)(i) the child's emotional ties with and feelings toward the child's parents, the child's siblings, and others who may affect the child's best interests significantly;

(ii) the child's adjustment to [community, home, placement, and school];

(iii) the child's feelings about severance of the parent-child relationship; and

(iv) the likely impact of terminating parental rights on the child's well-being.

Md.Code (1984, 2006 Repl.Vol.), § 5–323(d) of the Family Law Article ("FL").

8. Unless otherwise specified, all statutory references to the Family Law Article are to the 2006 Replacement Volume of the 1984 Code, the version in effect at the time of the TPR hearing in this case. The General Assembly has since amended that subsection to reflect our

the "child's best interests." Accordingly, the best interests of the child must "trump[ ] all other considerations." *See In re Adoption/Guardianship of Ta'Niya C.,* 417 Md. 90, 111, 8 A.3d 745, 758 (2010).

Here, Ms. F. argues that, in addition to the extensive list of factors crafted by our General Assembly, this Court should adopt a four-factor test that would define " 'fitness to parent' within the parameters of a TPR case." She submits that this test should be applied before a juvenile court engages in a "best interests analysis" pursuant to Section 5–323(d). According to Ms. F., termination should only be possible if:

> 1) . . . after being provided with appropriately tailored reunification services, the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm; or 2) [if] the parent has consistently failed to comply with an appropriately structured service agreement offered by the Department for a period of longer than one year; and 3) . . . all alternatives to termination have been exhausted, and; 4) . . . termination will not do more harm than good.

holding in *Rashawn* that, "implicit from the statutory scheme[,]" a court must find either parental unfitness or exceptional circumstances before terminating parental rights. *In re Adoption/Guardianship of Rashawn H.,* 402 Md. 477, 498, 937 A.2d 177, 190 (2007). Accordingly, FL Section 5–323(b) currently reads as follows:

> (b) *Authority.*—If, after consideration of factors as required in this section, a juvenile court finds by clear and convincing evidence that a parent is unfit to remain in a parental relationship with the child or that exceptional circumstances exist that would make a continuation of the parental relationship detrimental to the best interests of the child such that terminating the rights of the parent is in a child's best interests, the juvenile court may grant guardianship of the child without consent otherwise required under this subtitle and over the child's objection.

FL § 5–323(b) (1984, 2006 Repl.Vol., 2010 Supp.). Notwithstanding this additional language, however, "the best interest of the child remains the ultimate governing standard." *Rashawn,* 402 Md. at 496, 937 A.2d at 189. *See In re Adoption/Guardianship of Ta'Niya C.,* 417 Md. 90, 112, 8 A.3d 745, 758 (2010) ("[T]he child's best interest has always been the transcendent standard in adoption, third-party custody cases, and TPR proceedings.").

Ms. F. goes on to apply this proposed test to her own situation, in claiming that her parental rights should not be terminated.

In considering the particulars of Ms. F.'s proposal, we find substantial overlap between the test Ms. F. suggests and the existing statutory factors, although her test recasts the analysis so that it seems to impermissibly favor the parent's best interests over those of the child. Ms. F.'s first proposed factor, which seems to stand on its own, would allow termination if a court found that "after being provided with appropriately tailored reunification services, the parent is unable to provide a safe and stable home for the child and that the delay in securing permanency continues or adds to the child's harm[.]" This consideration, however, is addressed in subsections 5–323(d)(1) and (d)(2), which require a juvenile court to consider the reunification services offered to a parent as well as the parent's effort in altering his or her circumstances so that returning the child to the parent is in the child's best interests. *See* F.L. § 5–323(d)(1)–(d)(2).

■ The second proposed factor, that "the parent has consistently failed to comply with [service agreements] for ... longer than one year[,]" is largely reflected in Section 5–323(d)(1)(iii), which requires a court to consider the extent to which a parent has complied with such agreements. *See* F.L. § 5–323(d)(1)(iii). Yet Ms. F.'s second factor diverges from the statute by imposing upon juvenile courts an arbitrary one year minimum of noncompliance before termination is permitted. She does not cite to any authority to support her one year restriction, nor can we find any in FL § 5–323 or our relevant caselaw. Although many TPR cases involve lengthy periods of non-compliance, for a year or more,[9] it is axiomatic

---

9. *See, e.g., Ta'Niya,* 417 Md. at 96, 8 A.3d at 748 (mother failed to comply with service agreements from October 2004 to January 2008); *In re Ashley E.,* 387 Md. 260, 273–74, 874 A.2d 998, 1006 (2005) (noncompliance lasted for 16 months); *In re Adoption/Guardianship of Joshua M.,* 166 Md.App. 341, 345, 888 A.2d 1201, 1203 (2005) (mother did not comport with service agreements issued from February 2002 to July 2004); *In re Adoption/Guardianship No. T00032005,* 141 Md.App.

that the issues in CINA cases "are very often fact-intensive." *In re Emileigh F.*, 353 Md. 30, 42, 724 A.2d 639, 645 (1999). Thus, "trial courts are endowed with great discretion in making decisions concerning the best interest of the child." *Petrini v. Petrini*, 336 Md. 453, 469, 648 A.2d 1016, 1023 (1994). We see no reason to limit that discretion simply to formulate a test with a specific time period.

Ms. F.'s final two factors are quite general in scope. Factor number three would require a court to find that "all alternatives to termination have been exhausted[,]" while the fourth factor demands that "termination will not do more harm than good." [10] Ms. F. expresses concern that courts often fast track termination proceedings in the belief that achieving permanency as soon as possible is always in the child's best interests. As evidence, she cites to a Harvard Law Review article in which the author opines that this trend followed the federal enactment of the Adoption and Safe Families Act of 1997 ("ASFA"), which

> readily embrac[es] the idea that family preservation may not be in the best interest of a child[, and] emphasizes 'freeing' children for adoption by terminating the rights of abusive or neglectful parents. ASFA favors adoption because ... it perceives adoption—correctly or not—as a quicker route to stability for children in many cases, and therefore as an option that satisfies a key assumption of the Act: that making earlier permanency decisions for long-term placement is always in the best interest of the child.

---

570, 574–75, 786 A.2d 64, 67 (2001) (noncompliance for a period of at least four years).

**10.** Ms. F.'s final factor, that "termination will not do more harm than good[,]" is vague as to whether a court should examine the harm to the child, to the parent, or to both. As stated above, the "child's best interests" standard governs TPR proceedings. Thus, insofar as the fourth factor concerns harm to the child, that sentiment is clearly encapsulated by Section 5–323(d)(4)(iv), which requires a court to evaluate the effect of termination of parental rights on a child's well being. *See* FL § 5–323(d)(4)(iv).

*Developments in the Law: VI. Unified Family Courts and the Child Protection Dilemma,* 116 Harv. L.Rev.2099, 2101 (2003). The commentator advocates for the Uniform Family Court model, which "approaches family law adjudication from a therapeutic perspective that envisions courts contributing to the goal of preserving families." *Id.* at 2099–2100.

■ Contrary to Ms. F.'s assertion, however, preservation of parental rights is a primary concern for juvenile courts. Indeed, in Maryland, there is a "strong presumption that the child's best interests ·are served by maintaining parental rights." *In re Adoption/Guardianship No. J9610436,* 368 Md. 666, 692–93, 796 A.2d 778, 793 (2002). *Cf.* FL § 5–323(d)(4)(iv) (requiring a juvenile court to consider the likely impact of terminating parental rights on a child's well-being). This presumption was immortalized in *Rashawn,* where this Court directed juvenile courts to carefully consider the interests of both parents and children:

> The court's role in TPR cases is to give the most careful consideration to the relevant statutory factors, to make specific findings based on the evidence with respect to each of them, and, **mindful of the presumption favoring a continuation of the parental relationship,** determine expressly whether those findings suffice either to show an unfitness on the part of the parent to remain in a parental relationship with the child or to constitute an exceptional circumstance that would make a continuation of the parental relationship detrimental to the best interest of the child, and, if so, how. If the court does that—articulates its conclusion as to the best interest of the child in that manner—the parental rights we have recognized and the statutory basis for terminating those rights are in proper and harmonious balance.

*Rashawn,* 402 Md. at 501, 937 A.2d at 192 (emphasis added). Accordingly, a juvenile court must faithfully examine each statutory factor, and cannot simply proceed under the assumption that "freeing a child for adoption" is inherently better than keeping the child in foster care and maintaining parental rights. *See In re Adoption/Guardianship No. T97036005,* 358

Md. 1, 23, 746 A.2d 379, 391 (2000) (reversing juvenile court's judgment to terminate parental rights where the Court could "only speculate whether the required factors were considered."); *In re Adoption/Guardianship No. 95195062/CAD*, 116 Md.App. 443, 457, 696 A.2d 1102, 1108 (1997) ("So important are these statutory considerations that, on review, [the Court] cannot be left to speculate as to whether the trial court has fulfilled its obligations.").

Ultimately, it is clear that the General Assembly's extensive list of factors, when considered in the light of the standing presumption favoring parental rights, reflect the spirit that termination is an alternative of last resort, and is not to be taken lightly. Thus, we conclude that to the extent that Ms. F.'s test is designed to protect parental rights, those rights are adequately guarded by Section 5–323 of the Family Law Article. Accordingly, we reject her recommendation, and instead shall analyze the juvenile court's ruling for compliance with Section 5–323 as it is written.[11]

*B. The Evidence of Ms. F.'s Unfitness and Section 5–323*

In assessing whether Ms. F.'s parental rights should be terminated, the juvenile court made the following findings with respect to each of the applicable statutory provisions contained within Section 5–323(d):

- The Department had "adequately presented the referrals" to Ms. F., who did not adequately respond to the referrals. *See* F.L. § 5–323(d)(1)(iii). Ms. F. provided "conflicting" testimony as to how long she had been clean from drugs, and had not provided the Department, or the court, with any proof that she had completed drug treatment. Re-

---

**11.** Moreover, as the Department correctly argues, Ms. F. does not offer any precedent in support of her new legal construct. In essence, she simply asks this Court to insert a new step into the statutory scheme governing the termination of parental rights—a step not contemplated by the General Assembly. Absent constitutional constraints, it is not our place to create a new statutory scheme to replace that which is contained within the Family Law Article. *See Governor of Md. v. Exxon Corp.*, 279 Md. 410, 428, 370 A.2d 1102, 1112 (1977) ("[C]ourts may not substitute their judgment for that of the Legislature.").

garding housing, the only documentation that she provided to the court was "an unsigned copy of a settlement statement, which [did] not contain her name on it." Moreover, with respect to Ms. F.'s cleaning business ("Cathy's Spic & Span Cleaning Services") the only documentary evidence was one type-written invoice from October 2008 "that ha[d] no verification except for [Ms. F.'s] testimony that [it was] a bill she submitted." Finally, Ms. F. has "made a stab at participating [in parenting classes], but she ha[d] not since completed one."

- Ms. F. had made positive efforts to maintain contact with the Children, adjust her circumstances to facilitate the Children's return, and communicate with the Department. Yet, Ms. F. had "failed to live up to her commitments under the ... service agreements" and there had been "limited to no contact" between Ms. F. and the Fas. *See* F.L. §§ 5–323(d)(2), (d)(2)(i).

- Ms. F. had been paying $150 per month in child support, as required by court order. *See* F.L. § 5–323(d)(2)(ii).

- There was insufficient evidence to show that extending the eighteen month period allowed for "parental adjustment" would be in the best interests of the Children. *See* F.L. § 5–323(d)(2)(iv).

- There was no evidence that Ms. F. had abused the Children, chronically or otherwise, nor that she had subjected the children to sexual abuse or torture; there was, however, evidence of neglect, including life-threatening neglect. Some of this neglect had served as the basis for the Children's original CINA adjudications. *See* FL §§ 5–323(d)(3)(i), (d)(3)(iii).

- There was no specific evidence that Ms. F. had refused drug treatment, but she had failed to carry out her commitments under the service agreements to enter drug treatment and drug screening. *See* FL § 5–323(d)(3)(ii)(2).

- There was no evidence of the following: that either of the Children or Ms. F. tested positive for drugs at either

Amber or Mark's birth; that Ms. F. had committed, aided, or abetted relevant crimes; or that Ms. F. had involuntarily lost parental rights to any of the Children's siblings. *See* FL §§ 5–323(d)(3)(ii)(1), (d)(3)(iv), (d)(3)(v).

- With regard to the Children's emotional state, the court examined the state of their ties with Ms. F., the Fas, and each other, as well as how termination of parental rights would affect those connections and the Children's well-being. *See* FL § 5–323(d)(4). On the whole, the evidence suggested that the Children's visitation with Ms. F. had been positive, yet the Children experience some anxiety as a result of continued visitation with Ms. F. Additionally, the Children had adjusted well to their new placement, which the court described as a "warm and loving home in which [the Children] refer to the foster parents as Mom and Dad or Mommy and Daddy." Amber's level of performance in kindergarten was additional evidence of a "good adjustment to the placement. . . ."

After analyzing the relevant statutory factors, the court turned its attention to the presumption that it was in the Children's best interests to maintain Ms. F.'s parental rights:

[W]e turn now to [the] substantive presumption of law, . . . that it is in the best interest to remain in the care and custody of their parents. And the issue is whether . . . that presumption has been overcome by clear and convincing evidence showing either that the parent is unfit or that exceptional circumstances exist.

The court found the evidence clear and convincing that Ms. F. had a longstanding substance abuse problem, one that she had yet to overcome, and thus she was an unfit mother.[12] Accord-

---

12. In determining that Ms. F. was an unfit parent, by clear and convincing evidence, the court accurately noted the overall standard required by the statute:

[T]he statute . . . requires this Court to give primary consideration to the health and safety of the child, and consideration of all other factors needed to determine whether terminating a parent's rights is in the child's best interest, including those which are specifically listed in the statute.

ingly, the court concluded that its was in the Children's best interests to terminate Ms. F.'s parental rights.[13]

On appeal, Ms. F. argues that "the evidence was insufficient" to support the court's finding of parental unfitness. We disagree, and hold that the court's findings are supported by testimonial and documentary evidence. According to the juvenile court, Ms. F.'s problems with substance abuse was "[t]he key issue" as to her parental unfitness. The court noted her long history of illegal drug use (benzodiazepines and heroin, in particular), and it found that, despite being given numerous referrals for drug treatment, Ms. F. "ha[d] not responded adequately to those referrals."

This finding is supported by Ms. F.'s own admission of heroin use in the past, and the fact that Ms. F. never provided the Department or the court with any proof of her recovery. She did not produce any verifying information about her claimed participation in a Narcotics Anonymous program, nor did she admit into evidence any proof that she had submitted to drug testing. Instead, she provided inconsistent testimony about how long she had been free from drugs, saying first that she had been clean since 2006 and was "coming up on two years clean[,]" and then changing that to 2005 and "three years" clean on cross-examination.

Moreover, Ms. F. failed to abide by the conditions of numerous service agreements which she entered into with the Department. This was established by six different case plans submitted into evidence which stated that, for over a year, "Mother ha[d] not met the terms of her service agreement." Once again, Ms. F. did not produce any evidence to rebut

---

*See* FL § 5–323(d) (imposing the above standard).

13. As the juvenile court's analysis focused on Ms. F.'s fitness as a parent, it did not need to make any findings with respect to "exceptional circumstances" requiring the termination of parental rights. *See Rashawn*, 402 Md. at 498, 937 A.2d at 190 (holding that the presumption favoring parental rights "may be rebutted only by a showing that the parent is either unfit or that exceptional circumstances exist that would make the continued relationship detrimental to the child's best interest.").

these assertions. Indeed, with regard to the condition that she attend parenting classes, Ms. F. even testified that she attended only three classes out of the requisite twelve before making the unilateral decision that they were unnecessary because they taught her "the same exact thing" that she learned in her prior parenting classes. Overall, Ms. F.'s uncooperative attitude signaled to the court that "there [was] not enough evidence of hope" for a change in the future. Ultimately, we see no error in the juvenile court's assessment that this evidence was clear and convincing as to Ms. F.'s unwillingness to alter her previously unfit conduct.

Finally, the court's findings specific to the Children's emotional state and its conclusion that "[t]he likely impact of terminating parental rights on the child's well being is that [the placement] will continue to be a stable home environment .... [because the] children ha[d] adjusted to the placement" is supported by the testimony of two social workers. Both Okafor and Smith testified about the Children's emotional attachment to the Fas and the emotional strain caused by visits with Ms. F. Additionally, Ms. F. admitted that her children had referred to her as "Ms. [C]athy" instead of "mom" or "mother," and that she had to correct them. In a TPR case, we must treat the juvenile court's evaluation of witness testimony and evidence with the greatest respect. *See Cecil County Dep't of Soc. Svcs. v. Goodyear,* 263 Md. 611, 622, 284 A.2d 426, 431 (1971) (holding, in a TPR case, that where the record showed enough evidence to support a trial court's findings, "the greatest respect must be accorded the opportunity [it] had to [observe] the witnesses[.]"). Here, Ms. F. offers no counter to the juvenile court's finding, and presents no reason why we should not credit its determinations with respect to the Children's emotional states. Consequently, we can find no clear error in the juvenile court's conclusions.

### C. *Burden Of Persuasion/Burden Of Production*

Closely intertwined with her assertion that the juvenile court lacked sufficient evidence to find parental unfitness,

Ms. F. also contends that the juvenile court inappropriately shifted to her the burden of proving her sobriety, employment, and home ownership, rather than requiring the Department to prove its allegations through clear and convincing evidence. Ms. F.'s argument, however, fails to apprehend the distinction between the two components of "burden of proof:" the burden of persuasion and the burden of production. *See Montgomery County Fire Bd. v. Fisher,* 298 Md. 245, 256, 468 A.2d 625, 630–31 (1983) (discussing the two components). *See generally* Joseph F. Murphy, Jr., *Maryland Evidence Handbook* § 400–02 (4th ed. 2010). The burden of persuasion establishes the degree of evidence that must be presented—in this case, clear and convincing—in order for any given issue to be proven to the trier of fact. *See Wills v. State,* 329 Md. 370, 373–74, 620 A.2d 295, 296 (1993) (describing the different standards of proof, including "clear and convincing"). A party that bears the burden of production on any issue, however, merely bears the burden of "going forward with the evidence . . . [which] is usually cast first upon the party who has pleaded the existence of the fact, but . . . may shift to the adversary when the pleader has discharged his initial duty." *Kassap v. Seitz,* 315 Md. 155, 162, 553 A.2d 714, 717 (1989) (*quoting Commodities Reserve Corp. v. Belt's Wharf,* 310 Md. 365, 368 n. 2, 529 A.2d 822, 823 n. 2 (1987)).

The distinction between these two concepts is critical. To be sure, the Department bore the burden of persuading the juvenile court of Ms. F.'s unfitness as a parent, through the presentation of clear and convincing evidence, and any component of that unfitness was subject to that same standard. *See* FL § 5–323(b). Once the Department had presented evidence on this issue to the juvenile court, however, the judge could decide that burden of *producing* relevant evidence shifted to Ms. F. Quoting evidence scholar Dean McCormick, this Court explained in *Commodities Reserve,*

One burden is that of producing evidence, satisfactory to the judge, of a particular fact in issue. The second is the burden of persuading the trier of fact that the alleged fact is true. The burden of producing evidence on an issue means

> the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced

*Commodities Reserve,* 310 Md. at 368 n. 2, 529 A.2d at 823 n. 2. In this case, the Department had the burden of producing evidence that Ms. F. was addicted to illegal drugs. To meet that burden, it offered proof of her undisputed history of addiction. The trial judge was satisfied that this evidence showing a history of addiction was sufficiently strong to infer that, in the absence of credible evidence to the contrary, the addiction problem continued. This is a classic example of how the burden of production can operate. The Department met the burden of production in a way satisfactory to the judge, thereby shifting the burden of production to Ms. F., which meant that she risked "the liability to an adverse ruling (generally a finding or directed verdict) if evidence on the issue has not been produced." *Id.*

 The trial court's finding that the Department's evidence was sufficient to meet its burden of production on the issue of Ms. F's addition was reasonable. Unquestionably, parental drug use can negatively impact a child.[14] *See In the Interest of J.A.,* 286 Ga.App. 704, 649 S.E.2d 882, 885 (2007) ("[I]t is a fair inference that use of controlled substances by a parent has an adverse effect on a minor child."); *see also*

---

**14.** As explained by one commentator:

> Turning to predictive parental characteristics, child maltreatment strongly correlates with parental substance abuse, mental illness, and prior maltreatment of another child: birth parents with substance abuse problems are (a) at a pronounced higher risk of child maltreatment, (b) extremely unlikely to overcome an addiction prior to the time when their baby needs to form a secure attachment to a consistent, nurturing caregiver, regardless of what assistance they receive, (c) very likely to have child protective services (CPS) remove their children from their custody at some point anyway, and (d) extremely unlikely to reunify successfully following removal.

James G. Dwyer, *The Child Protection Pretense: States' Continued Consignment of Newborn Babies to Unfit Parents,* 93 Minn. L.Rev. 407, 424–25 (2008) (referencing "studies showing the elevated risk of maltreatment recurrence when children are returned to parents who have had substance abuse problems").

Steve Baron, *Issue Facing Family Courts: The Scope of Family Court Intervention,* 4 J. Center for Fam. Child. & Cts. 115, 121 (2003) ("Several studies indicate that past, as well as current, parental substance abuse increases the risk of child abuse."). Moreover, given the well-known difficulty of overcoming drug addiction, and the likelihood that addiction will persist if untreated, a court can infer that a parent will continue to abuse drugs unless he or she seeks treatment. *See Adoption of Scott,* 59 Mass.App.Ct. 274, 795 N.E.2d 588, 589 n. 3 (2003) (mother deemed unfit, in part, because she "demonstrated a history of drug addiction which [was] reasonably likely to continue ... given her resistance to cooperate with needed treatment[.]"); *Adoption of Elena,* 446 Mass. 24, 841 N.E.2d 252, 258 (2006) ("A condition which is reasonably likely to continue for a prolonged indeterminate period, such as ... drug addiction[,] ... is not a temporary condition."). This inference can shift to the parent the burden to produce evidence of sobriety, and if no such evidence is produced, the inference may satisfy the clear and convincing evidence standard. *Cf. In the Interest of J.A.,* 649 S.E.2d at 885 ("[E]vidence of the father's continued failure to seek drug treatment, [along with other factors,] is sufficient clear and convincing evidence to support ... the conclusion that ... parental rights [should be] terminated[.]").

Although the burden of *production* may have shifted to Ms. F., the burden of *persuasion* remained with the Department. That is, Ms. F. would not have been required to generate enough evidence demonstrating her sobriety, employment, or home ownership to meet the clear and convincing standard, or indeed any standard of persuasion at all. With respect to her sobriety—the key issue—Ms. F. was uniquely situated to produce this evidence. Without hourly monitoring of her comings and goings, the Department could not prove the negative fact that she had not abstained from substance abuse, or had not been through the necessary rehabilitation to conquer the addiction. Yet, Ms. F. would not furnish the Department or the court with any evidence that she had attended

drug treatment or had submitted to drug testing.[15] The court found that Ms. F.'s unwillingness to share her self-proclaimed drug successes with the Department "defie[d] understanding." We see no error in this assessment. *See May v. May*, 829 S.W.2d 373, 378 (Tex.App.1992) (father denied custody of his children because "[a]side from his testimony that he had been 'clean and straight for the last two years,' there was no evidence that [he] had rehabilitated or that future drug use is unlikely.").

Further, the only documentation supporting Ms. F.'s assertion that she had fulfilled her housing requirement was an unsigned copy of a settlement statement that did not even contain her name. Regarding Ms. F.'s employment, the girlfriend of her nephew testified that she had helped Ms. F. "write stuff down" for Cathy's Spic & Span Cleaning Services, but admitted that she had never traveled with Ms. F. to a job site. The only physical evidence to corroborate the testimony was "one type-written invoice dated October 3, 2008, that ha[d] no verification except for [Ms. F.'s] testimony that that [was] a bill she submitted.[16] Once again, there was no error in the court's unwillingness to credit this evidence.

## CONCLUSION

We hold that the existing statutory scheme is appropriate in evaluating parental fitness for the purposes of terminating parental rights. Moreover, the juvenile court here did not inappropriately shift a burden of proof to Ms. F. with respect to demonstrating her compliance with the required drug treatment program, nor did the court commit clear error in making its factual findings. Accordingly, the court did not err in determining that Ms. F. was an unfit parent within the

---

**15.** According to Ms. F., she failed to produce verification of participation in drug testing simply because it "slipped [her] mind."

**16.** The court acknowledged that Ms. F. had some source of income because she was able to pay child support. Yet, the court appeared to credit this to her receipt of social security benefits.

definition of Section 5–323, or that it was in the Children's best interests to terminate Ms. F.'s parental rights.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.**

HARRELL and MURPHY, JJ., concur.

HARRELL, J., concurring, in which MURPHY, J., joins.

I join the judgment in this case. I concur with the Majority opinion's result and analysis, except for its Footnote 8 (Maj. op. at 710–11, 12 A.3d at 134–36). The reasons for my disagreement with this footnote are explained in my concurring opinion in *In Re: Adoption of Ta'Niya C.,* 417 Md. 90, 8 A.3d 745 (2010) (concurring opinion by Harrell, J., joined by Murphy, J.).

Judge MURPHY authorizes me to state that he joins the views expressed in this concurring opinion.